578 A.2d 370

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND CROSS–
RESPONDENT, v. JAMES CALVIN HILL,
DEFENDANT–RESPONDENT AND CROSS–APPELLANT.

Argued January 3, 1990—Decided August 1, 1990.

*John Kennedy,* Deputy Attorney General, argued the cause for appellant and cross-respondent (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney).

*Daniel V. Gautieri,* Assistant Deputy Public Defender, argued the cause for respondent and cross-appellant (*Alfred A. Slocum,* Public Defender, *Daniel V. Gautieri* and *William E. Norris,* Designated Counsel, of counsel and on the briefs).

The opinion of the Court was delivered by

GARIBALDI, J.

The fresh-complaint rule allows witnesses in a criminal trial to testify to a victim's complaint of sexual assault. The rule serves the limited purpose of negating the inference that the alleged victim's failure to have confided in anyone was incon-

sistent with her later claims of having been sexually assaulted. This appeal presents two questions regarding the fresh-complaint rule. The first question is whether a complaint elicited through questioning has the requisite spontaneity and voluntariness to qualify under the fresh-complaint rule. The second is whether trial courts should exclude cumulative fresh-complaint evidence.

I

The versions of the facts advanced by the accused and the accuser in this case vary dramatically. We will proceed chronologically and detail each side's account as well as the evidence adduced at trial to support each party's theory of the case.

A. *Background and events preceding the alleged sexual assault*

M.K., the accuser, was sixteen years old when the relevant events occurred. She resided in the Collier Group Home in Red Bank ("Home"). The Division of Youth and Family Services (D.Y.F.S.) operated the Home. Young women who could not live with their families resided at the Home. The Home was managed in part by Valerie McCabe, a senior child-care worker. Strict discipline was an integral part of the Home's management. The young women had to adhere to curfews and had to account for how they spent their time.

In March of 1985, Calvin Hill, eighteen years of age, moved across the street from the Home after having left North Carolina. He lived with his aunt, uncle, and cousins. One of his cousins, Anthony Jones, was romantically involved with C.W., a resident of the Home.

B. *The Incident*

*M.K.'s Version*

Around 4:30 on the afternoon of Sunday, April 14, 1985, M.K. was walking home with C.W. from her part-time job at the

Monmouth Art Center in Red Bank. The young women met Anthony Jones. He asked them if they wanted to go to a party. The women agreed and went into Jones' house. They congregated in the bedroom Jones shared with Hill, and a short time later Hill and a friend, Joe Brandon, came in the room.

The young people played music, drank beer, and smoked marijuana. M.K. drank but did not smoke marijuana. M.K. claims that at one point during the early evening, she left the bedroom to use the bathroom. She asked someone where the bathroom was, and he waved her upstairs. It was very dark in the room atop the stairs, and when she realized it was not a bathroom, she turned to leave but found Hill blocking the doorway. When she tried to leave, he blocked her way, warned her not to scream because no one would hear her above the loud music. He then raped her.

A short while later, Anthony Jones knocked on the door. Hill got up and talked to his cousin through the closed door. M.K. got dressed. Before letting her leave the room, Hill warned her not to tell anyone.

M.K. went back to the bedroom where the teenagers had congregated, and started drinking heavily. A while later, C.W. came back to the room and the two of them went home. When the two women arrived at the Collier home, in order to avoid being punished they said they had been working late.

*Calvin Hill's Version*

Hill learned from his cousin, Anthony Jones, that M.K. and C.W. were supposed to come over for a party after work on Sunday. M.K. was supposed to meet Joe Brandon for a blind date at the house.

When the group convened in the bedroom, there were only three beers available and no marijuana. The topic of conversation quickly became sex. Shortly thereafter, M.K. told C.W. and C.W., in turn, told Anthony Jones that M.K. liked Hill. Hill asked M.K. to go upstairs to the attic with him. She did not respond, and he did not ask again.

More people came to the party. A while later, C.W. and Anthony Jones began to leave the room. M.K. got up to go with them. She gestured to Hill to come with her. He followed her upstairs to the attic. The music was not loud because Mr. Hill's aunt had come home and asked that the volume be lowered.

The room was dark because it was nightfall. They did not turn on the lights. Hill claims that M.K. invited him to have sexual relations with her, but that he did not. After approximately five minutes, his cousin knocked on the door. When he emerged from the room, his cousin and C.W. were waiting at the bottom of the stairs.

C. *Events subsequent to the alleged incident: M.K.'s version*

On May 25, 1985, D.R., a seventeen-year-old resident of the Home went into M.K.'s room crying. She told her that Hill had raped her. M.K. related that Hill had raped her as well, but asked D.R. not to tell anyone because she was afraid of what Hill might do to her. Hill was charged with raping D.R. The same jury that convicted Hill of raping M.K. acquitted him of raping D.R.

On June 2, 1985, a street fight erupted that involved a group consisting of M.K., D.R., and Kevin Rogers, D.R.'s boyfriend, against Calvin Hill and Anthony Jones. Jones had asked the group if they wanted to go to a barbeque. When they refused, Jones and Hill became angry. A fight ensued in which Hill tried to strike Kevin Rogers. When D.R. got in between the two, Hill punched her in the face. He also pushed M.K. against a tree. Hill then took out a knife. Rogers grabbed a bottle from the street and broke it. At that point, a friend of Hill ushered him away.

Valerie McCabe heard the ruckus and called the police, who took D.R., M.K., Kevin Rogers, and Calvin Hill, along with Ms. McCabe, to the police station. The police placed Calvin Hill in a

room with an officer and D.R., M.K. and Ms. McCabe in a separate room.

The policeman who was in the process of interviewing Hill came into the room where another officer was interviewing D.R., M.K., and Ms. McCabe. He whispered to the officer that Hill had said both D.R. and M.K. were former girlfriends and that he had had sexual relations with both of them. The policeman asked the young women, in front of Ms. McCabe, whether that was true. M.K. said it was not true, and D.R. remained silent.

On the way home, Ms. McCabe asked the young women again in the car whether what Hill had said was true. Kevin Rogers was present, and the women were not willing to talk in front of him. When they got to the house, Ms. McCabe asked D.R. again whether she had been having sexual relations with Calvin Hill. D.R. responded that Calvin Hill had raped her. M.K. said nothing. Ms. McCabe then called the police once more.

Detective Hoffman came to the house. D.R. told him Hill had raped her. Ms. McCabe then called M.K. into the room. The policeman questioned her about whether she had also been raped. She began crying, and said she had been. Hill was subsequently arrested.

On September 15, 1985, M.K. alleges that she saw defendant in the Red Bank train station and that he told her that he knew he would be going away for the crime he committed but that he would get her when he got out. M.K. was on her way to visit her boyfriend. When she arrived at his home, she waited until very late in the evening to call the Home and the police about the threat. She told the Home supervisors that she could not go to the Home that night because she was too upset by Hill's threat.

*Calvin Hill's version*

Hill claims M.K. returned to his house a few days after the party, accompanied by D.R. The young women joined Hill, his cousin, and a few other friends in recording a cassette tape.

Hill admits to his role in the June 2nd fight. He differs in his account only to the extent that he denies having pulled a knife. Hill also denies having ever seen M.K. at the Red Bank train station.

### D. *Trial and Appellate process*

At trial, the State presented testimony from M.K., D.R., C.W., Valerie McCabe, and Detective Hoffman, together with that of less-significant witnesses. M.K. testified to her version of the events. D.R. gave an account of defendant's actions with regard to her and also reiterated that M.K. had complained of having been sexually assaulted by Hill. C.W. gave equivocal testimony, on the one hand corroborating M.K.'s story that there was a lot of liquor available at Hill's house and on the other hand saying that the party had been pre-arranged and that she had seen M.K. kissing Hill and sitting on another young man's lap. Valerie McCabe testified to having heard M.K. say to Detective Hoffman that Calvin Hill had raped her. Detective Hoffman also testified to having questioned M.K. and having heard her complaint. D.R.'s, Ms. McCabe's, and Detective Hoffman's testimony were admitted into evidence under the fresh-complaint rule over defense objections.

The defense presented Calvin Hill, Joe Brandon, and William Dalton, a private investigator, among other witnesses. Hill testified to his version of the facts. Joe Brandon corroborated Hill's story. Dalton, a private investigator, testified that Ms. McCabe had told him that she hoped Mr. Hill would be hanged, and that she had to admit that the young women in the Collier home led active sexual lives.

The jury convicted Hill of committing sexual assault and sexual contact on M.K. Defendant appealed. The Appellate Division held that D.R.'s testimony of M.K.'s May 25th fresh complaint had been properly admitted but that it had been inappropriate for the trial court to have admitted McCabe's and Hoffman's cumulative fresh-complaint testimony. Because it

was a close case, the Appellate Division held that the erroneous admission of McCabe's and Hoffman's repetitive fresh complaint evidence had been unduly prejudicial to defendant. Accordingly, the Appellate Division reversed the conviction and remanded the case for a new trial.

We granted the State's petition for certification. 117 *N.J.* 60, 563 *A*.2d 826 (1989). Defendant's cross-petition for certification from that portion of the Appellate Division's decision that dealt with D.R.'s testimony was also granted. 118 *N.J.* 238, 570 *A*.2d 987 (1989).

## II

### A. *Historical Development of Fresh–Complaint Rule*

The fresh-complaint doctrine evolved as a response to the common-law requirement of "hue and cry." Victims of violent crimes were expected to cry out immediately and alert their neighbors that they had been violently assaulted. The neighbors could then initiate a collective search for the aggressor. The "hue and cry" also served to dispel any suspicion that the victim had been somehow involved or complicit in the crime:

> When a felony is committed, the hue and cry (hutesium et clamor) should be raised. If, for example, a man comes upon a dead body and omits to raise the hue, he commits an amerciable offense, besides laying himself open to ugly suspicions ... The neighbors should turn out with the bows, arrows, and knives that they are bound to keep and, besides much shouting, there will be horn blowing, the 'hue' will be 'honored' from vill to vill. [2 F. Pollock & F. Maitland, *The History of English Laws* 578–79 (2d ed. 1923) (footnotes omitted).]

Trial courts required full details of the victim's complaint as a necessary element of the prosecution's case in those instances of violence. *Ibid.*

The courts applied the same "hue and cry" requirement in rape cases:

> When therefore a virgin has been so deflowered and overpowered against the peace of the lord the King forthwith and while the act is so fresh she ought repair with hue and cry to the neighboring vills and there display to honest men the injury done to her, the blood and her dress stained with blood, and the

tearing of her dress, and so she ought to go to the provost of the hundred and to the searjeant of the lord the King and to the coroners and to the viscount and make her appeal at the first county court. [H. DeBracton, *DeLegibus Angliae,* f. 147 (ca. 1250) (quoted in 6 J. Wigmore, Evidence § 1760, at 240 (Chadbourn rev. 1976)).]

As applied in rape cases, the "hue and cry" requirement appeared to assume that only virgins who sustained grave physical harm should raise the hue and cry necessary to prosecute a rape by a stranger. That standard implicitly asserted that women who were not virgins, women who were raped by people they knew, women who did not sustain bloody physical injuries in the process of being raped, and women who kept silent about being raped after the attack did not qualify to raise the "hue and cry." Because "hue and cry" was a necessary prerequisite for a court to hear a rape case, the excluded categories of women could not have their cases prosecuted. Later, courts heard cases in which women had not raised the hue and cry after having been raped. In those cases, however, the courts allowed the evidence of the woman's silence to be introduced as a self-contradiction to her later claim of rape. *See* Note, "A Matter of Time: Evidence of a Victim's Prompt Complaint in New York," 53 *Brooklyn L.Rev.* 1087 (1988).

Gradually, the "hue and cry" rule proved largely ineffective because it did not assure the capture of the perpetrator and because even someone complicit in a crime could raise a cry of complaint. Other methods, such as the offering of monetary rewards and criminal immunity for information leading to the apprehension of the perpetrator, proved more useful in apprehending and prosecuting violent offenders. 1 L. Radzinowicz, *A History of English Criminal Law* 27 (1956).

Ironically, courts continued to require hue and cry in rape cases, and held it against the State if the woman had not confided in anyone after the attack. 4 Wigmore, § 1134, 297 n. 2. This continued adherence to the hue and cry in rape cases willfully ignored both its ineffectiveness in every other context, and the possibility that women would keep silent about rape because more than any other violent crime it could shed shame

and embarrassment on the victim. Courts in effect believed that "[i]t was entirely natural, after becoming the victim of an assault against her will, that [a woman] should have spoken out. That she did not, that she went about as if nothing had happened, was in effect an assertion that nothing violent had been done." *Ibid.* The "hue and cry" doctrine in rape cases ceased to function as a means of facilitating the capture of the perpetrator and became a way to dispel suspicion that the victim had fabricated the charges. Matthew Hale, the eighteenth-century jurist, reflected the tone of his times when he stated that "[r]ape is ... an accusation easily to be made and hard to be proved, and harder to be defended by the party accused." M. Hale, *The History of the Pleas of the Crown* 635 (1778). Because the details of the "hue and cry" were admissible as evidence of the rape, testimony concerning hue and cry was substantive evidence against the accused. *Ibid.*

In the early 1800s courts began to examine more closely the principles underlying the rules of evidence. *Ibid.* Courts developed the hearsay rule, barring witnesses from repeating statements made out-of-court by other people. C. McCormick, *McCormick on Evidence* § 246 (3d ed. 1984). Partly because of that development, the "hue and cry" rule in rape cases was replaced by the fresh-complaint rule. The fresh-complaint rule excluded the details of the complaint and did not allow testimony in order to prove the underlying issue of whether the woman had been raped. The narrow purpose of the rule was to negate any inference that because the victim had failed to tell anyone that she had been raped, her later assertion of rape could not be believed. *R. v. Walker,* 2 *Moo. & Rob.* 212 (1839).

Juries were permitted to draw a negative inference from the lack of a fresh complaint, and courts often instructed juries to do just that. *State v. Thomas,* 351 *Mo.* 804, 818, 174 *S.W.*2d 337, 345 (1943) ("defendant is entitled to a proper cautionary instruction advising the jury that the failure of the prosecutrix to make a complaint seasonably after the assault is a circumstance for their consideration along with the other facts in

evidence"). In part that rule was intended to protect defen-
dants against false charges of rape.

While the "hue and cry" rule was intended, in part, to
contradict any inference of complicity or guilt of the crime on
the part of the alleged victim, the fresh-complaint rule indicated
that women's charges of rape were valid even if they were not
corroborated by an outcry shortly after the incident. Unfortu-
nately courts continued to adhere to the prevailing idea that it
was "natural" for a woman to complain, and that if she failed
to complain, the only rational explanation was that she had not
really been raped. *Baccio v. People*, 41 *N.Y.* 265, 268 (1869)
("it is so natural as to be almost inevitable that a female upon
whom the crime has been committed will make immediate
complaint thereof to her mother or other confidential friend
and, inasmuch as her failure to do so would be strong evidence
that her affirmation on the subject when examined as witness
was false, that the prosecution may anticipate such a claim by
affirmative proof that complaint was made"); *State v. Neel*, 21
*Utah* 151, 155–56, 60 *P.* 510, 511 (1900) ("The natural instinct of
a female thus outraged and injured prompts her to disclose the
occurrence, at the earliest opportunity, to the relative or friend
who naturally has the deepest interest in her welfare; and the
absence of such a disclosure tends to discredit her as a witness,
and may raise an inference against the truth of the charge").

When courts did acknowledge reasons why a woman would
choose to remain silent, they treated the silence as a contra-
diction that nevertheless could be explained away. Hence, they
still retained the presumption that a normal woman would
complain after having been raped. *State v. Icenbice*, 126 *Iowa*
16, 101 *N.W.* 273 (1904); *State v. Peterson*, 110 *Iowa* 647, 82
*N.W.* 329 (1900); *Commonwealth v. Colangelo*, 256 *Mass.* 165,
152 *N.E.* 241 (1926); *People v. Ezzo*, 104 *Mich.* 341, 62 *N.W.* 407
(1895); *State v. Shettleworth*, 18 *Minn.* 208 (1872); *State v.
Knapp*, 45 *N.H.* 148, 155 (1863); *People v. Flaherty*, 162 *N.Y.*
532, 57 *N.E.* 73 (1900); *Sanchez v. Gestera*, 7 *P.R. Fed.* 279
(1914).

The idea that women normally complained after being raped and that those who did not were deviant from the norm tied into this century's popular beliefs about the psychology of women. Professor Wigmore argued that rape complainants should be examined by a psychiatrist and the results of the examination revealed to a jury because "[rape complainants'] psychic complexes are multifarious, distorted partly by inherent defects, partly by diseased derangements or abnormal instincts, partly by bad social environment, partly by temporary physiological or emotional conditions." [3A J. Wigmore, *Evidence*, § 924a, at 736 (Chadbourn rev. ed. 1970); *see also* Note, "Corroborating Charges of Rape," 67 *Colum.L.Rev.* 1137 (1967) ("[s]urely the simplest, and perhaps the most important reason not to permit conviction for rape on the uncorroborated word of the prosecutrix is that that word is very often false" (footnote omitted)).]

The view of the ambivalent woman, couched in psychiatric, Freudian terms, served to cast doubt on complaints of rape well into the late part of this century. *Note*, "Forcible and Statutory Rape: An Exploration of the Operation and Objectives of the Consent Standard," 62 *Yale L.J.* 55, 67 (1952) ("a woman's need for sexual satisfaction may lead to the unconscious desire for forceful penetration, the coercion serving neatly to avoid the guilt feelings which might arise after willing participation").

The Model Penal Code, published in 1980, echoes earlier cases and commentaries in its distrust of ambivalent, lying, or vindictive women who fabricate rape charges. The Code explains that "[t]he requirement of prompt complaint springs in part from a fear that unwanted pregnancy or bitterness at a relationship gone sour might convert a willing participant in sexual relations into a vindictive complainant." Model Penal Code § 213.6 comment at 421. The Code commentary also expresses the view that

[t]he woman's attitude may be deeply ambivalent. She may not want intercourse, may fear it, or may desire it but feel compelled to say 'no.' Her

confusion at the time of the act may later resolve into non-consent.... The deceptively simple notion of consent may obscure a tangled mesh of psychological complexity, ambiguous communication, and unconscious restriction of the event by the participants. [Model Penal Code § 213.1 comment at 307 (1980).]

Susan Estrich, in her definitive article on rape, comments on the Code's imposition of a time requirement, not only for purposes of fresh complaint but also for filing of criminal charges of rape:

The Code commentary on the fresh complaint rule is startlingly attentive to the problem of the vindictive, spurned woman, but silent about the woman who legitimately worries about the receptiveness of police, prosecutors, juries and even friends or employers to a report that she was raped. If the statistics are credited at all, rape's uniqueness comes not in the disproportionate numbers of fresh complaints, but in the disproportionate number of cases that are never reported at all. . That rape, particularly among acquaintances, is a strikingly underreported offense; that. the adverse consequences of pursuing a rape complaint may be substantial; in short, that there may be legitimate reasons for delay, is not even acknowledged by the Code. Instead, in order to protect men from an unsubstantiated risk of lies or blackmail, the Code imposes an initial statute of limitations of unique and unheard of brevity in the criminal law, regardless of the circumstances or justifications for delay in the particular case. [Estrich, "Rape," 95 *Yale L.J.* 1087, 1140 (1986).]

The Code thus evokes the earlier common law in a way suggesting that centuries of legal history have witnessed little evolution in the law of rape.

In sum, the fresh-complaint rule originated as a response to the common-law "hue and cry" doctrine. The fresh-complaint rule, however, continued to exist long after the demise of the "hue and cry" doctrine. Courts and commentators, from the late nineteenth century to recent years, often based the necessity for the fresh complaint rule on their distrust of women complainants. Moreover, those courts and commentators often based their continued adherence to the rule on intuitive, pseudo-Freudian analysis of the ways a "normal" woman would react to sex and to rape.

The fresh-complaint doctrine assumed the existence of those prejudices as well as afforded the prosecution one manner of countering those negative inferences. For, if a "normal" woman would "naturally" complain after having been raped, then

juries could believe that a complaint was good evidence that defendant in fact had committed the rape. Hence, even though the present fresh-complaint rule has the stated purpose of merely negating the inference that silence means no rape had occurred, juries could misapply it, absent able trial-court guidance, to mean that the fresh complaint is substantive evidence of the rape. In such a case, the fresh-complaint rule would not only help the victim but also could result in prejudice against the defendant.

### B. *Current Status of the Law of Fresh Complaint*

#### 1. Viability of the fresh complaint rule

■ We must first consider the continued viability of the fresh-complaint rule. The present rule in New Jersey is that to qualify as fresh complaint, the victim's statements to someone she would ordinarily turn to for support must have been made within a reasonable time after the alleged assault and must have been spontaneous and voluntary. *State v. Tirone,* 64 *N.J.* 222, 226–27, 314 *A.*2d 601 (1974); *State v. Balles,* 47 *N.J.* 331, 338–39, 221 *A.*2d 1 (1966), *cert. denied* and *appeal dismissed,* 388 *U.S.* 461, 87 *S.Ct.* 2120, 18 *L.Ed.*2d 1321 (1967). At trial, fresh-complaint evidence serves a narrow purpose. It allows the State to negate the inference that the victim was not sexually assaulted because of her silence. 4 J. Wigmore, *supra,* § 1135 at 297–301. Only the fact of the complaint, not the details, is admissible. *Id.* § 1136, at 306–11. In addition, the victim must be a witness in order for the State to introduce fresh-complaint evidence. *Ibid.*

The entire area concerning sexual offenses committed against women only recently has been examined from the perspective of the rights of the woman-victim. *State v. Kelly,* 97 *N.J.* 178, 190–97, 478 *A.*2d 364 (1984) (expert evidence on battered-woman syndrome admitted). The parties in this case did not challenge the viability of the fresh-complaint rule.

Indeed, the State relied heavily on the fresh-complaint rule to support M.K.'s version of the incident.

It is true that the fresh-complaint rule does not necessarily contradict sexist notions of how a woman should act after she has been raped, but merely serves to establish that a woman acted in the "correct" or "natural" manner expected by society. Still, our judicial process cannot remove from every juror all subtle biases or illogical views of the world. The fresh-complaint rule responds to those jurors on their own terms.

In cases in which a woman does, in fact, confide in someone that she has been raped, the fresh-complaint rule serves to neutralize the sexist expectations of some jurors that the woman should have complained after having been raped. That is particularly true in cases, like this, where there is little evidence presented aside from the conflicting testimony of M.K. and Hill. Thus, the fresh-complaint rule certainly did not harm M.K., undoubtedly helped her, but at the very least made the proceedings fairer for her, a woman who did complain.

Although the fresh-complaint rule does not hurt those and indeed may help women who do complain, the issue then becomes whether the fresh-complaint rule so hurts those women who do not complain that it must be abolished. Balanced against that concern for the silent victims, of course, is the concern that defendants receive fair trials.

Society's perception and understanding of rape is changing. Yet, no one contends that subtle and overt bias against women victims of rape has been eradicated. Hence, we hesitate to discard the benefit of this rule to a woman who does complain without a clearer understanding of the burdens the rule may impose on the woman who does not complain. We are mindful that in some cases efforts to rid the judicial process of sexism by unreasoned reform have proven in practice to be worse medicine than the illness itself. *See* S. Estrich, *Real Rape, supra,* at 81–83 (discussing legislative reforms that meant to eradicate sexism from the language of rape statutes but that in

practice created new problems); Findlater, "Reexamining the Law of Rape," 86 *Mich.L.Rev.* 1356, 1356–57 (1988) (discussing some of the reforms to the law of rape and the rules governing proof of the crime, and asserting, however, that "until our understanding of the experience of rape changes, women will continue to be victimized by sexist assumptions that control the interpretation and application of the law of rape").

If we were to eliminate the fresh-complaint rule, rape victims would suffer whenever members of the jury held prejudices that women who do not complain have not really been raped. If we limit the fresh-complaint rule to the *res gestae* exception to the hearsay rule, allowing the admission of spontaneous or excited utterances, then women who had not complained very shortly after the crime would not be able to have their complaints admitted into evidence. *N.J.Evid.R.* 63(4). We could also allow third-hand testimony of a rape complaint only in response to defense counsel's impeachment of the woman complainant on the grounds that she recently fabricated the charges. *Evid.R.* 20. That alternative would allow the defense, and not the State, to control the circumstances under which the subject of a prior complaint is raised. As a result, the issue of a prior complaint would arise in a context prejudicial to the victim. Hence, until there is a clearer understanding of the perception of rape and its women victims, we think that the better solution is to allow fresh-complaint testimony to be admitted.

This case does not present the issue of the rights of a defendant to comment on a rape victim's silence. Resolution of that issue must incorporate procedures that protect both the accused and the victim. Given the complexity of the problem and society's slowly evolving understanding of sex offenses, its victims, and its offenders, we believe that the problem will benefit from more deliberate study that will allow both advocates of women's rights and representatives of defendants to present their views in a nonadversarial proceeding. This less-formal proceeding will allow a more expansive and complete

examination of the many ramifications involved in this serious and complex issue. We therefore refer to the Court's standing Committee on the Rules of Evidence and the Court's Criminal Practice Committee the task of recommending proposed procedures relating to the admissibility in the State's case of fresh-complaint evidence, defendant's right to elicit and rely on the absence of fresh-complaint; and the desirability of special instructions dealing with the issue. Until such procedures are developed, however, if a defendant introduces or elicits evidence of a victim's silence to prove that a rape did not occur, as additional protection, the trial court, if requested by the State, may instruct the jury that a woman may respond to rape in a variety of ways, including silence. In all other respects the trial court shall review the admissibility of a victim's silence under existing rules of evidence.

The other side of the equation is that the defendant has a constitutional right to a fair trial. Under the present rule the details of fresh complaint are excluded and the jury is instructed to consider the fresh-complaint evidence narrowly and not as substantive evidence of the crime. Under the *res gestae* rule, the complaint would be an exception to the hearsay rule, and would carry substantive weight. Thus, a defendant's rights, balanced against the interest in a fair proceeding that does not unduly humiliate or punish the victim of the crime, lead us to consider the fresh-complaint rule as a reasonable compromise. We thus turn to the application of the fresh-complaint rule to this case.

### 2. Complaints extracted through questioning

At issue here is whether the trial court properly admitted into evidence under the fresh-complaint rule the statements M.K. made to Valerie McCabe and to Detective Hoffman. Defendant argues that those statements are not spontaneous and voluntary but the result of vigorous coercive questioning by Ms. McCabe and the detective.

■ Courts have allowed fresh complaints made in response to general non-coercive questioning. (In cases dealing with young children, the courts have shown more latitude in the type and extent of questioning they have allowed to precede fresh complaint. We do not deal with the issue of a young child complainant in the present case but do so in *State v. Bethune*, 121 *N.J.* 137, 578 *A.*2d 364 (1990), also decided today.) In *People v. Harris*, 134 *Ill.App.*3d 705, 89 *Ill.Dec.* 446, 480 *N.E.*2d 1189, *appeal denied*, (1985), the Illinois court ruled that the fact that a statement is made in response to questions will not necessarily deprive an utterance of the spontaneity necessary for it to qualify as fresh complaint. In *People v. Hood*, 59 *Ill.*2d 315, 319 *N.E.*2d 802 (1974), the Supreme Court of Illinois ruled admissible as fresh-complaint evidence statements made by a victim in response to general questions. The victim in that case ran to the house of friends after having been raped, and when asked what was wrong, began to cry and told them she had been raped. In *People v. Damen*, 28 *Ill.*2d 464, 193 *N.E.*2d 25 (Illinois 1963), the victim was bleeding after having been raped. The victim told of the rape after the police asked her what had happened. The court held her statements admissible as fresh complaint. Similarly, in *People v. Evans*, 173 *Ill. App.*3d 186, 201–02, 122 *Ill.Dec.* 950, 960, 527 *N.E.*2d 448, 458 (Ill.App.1988), and *State v. Stevens*, 289 *N.W.*2d 592, 594–96 (Iowa 1980), the courts held admissible statements made in response to general, or non-coercive, questioning. We agree with those courts that statements made after non-coercive questions have the necessary spontaneity and voluntariness to qualify as fresh complaint.

■ On the other hand, statements that are procured by pointed, inquisitive, coercive interrogation lack the degree of voluntariness necessary to qualify under the fresh-complaint rule. The line, however, between non-coercive questioning and coercive questioning depends on the circumstances of the interrogation. We leave it to the trial court to determine in each case "when that line is crossed." *State v. Bethune, supra,* 121

*N.J.* at 145, 578 *A.*2d at 368. Among the factors a court should consider in making that determination are the age of the victim; the circumstances under which the interrogation takes place; the victim's relationship with the interrogator, *i.e.,* relative, friend, professional counselor, or authoritarian figure; who initiated the discussion; the type of questions asked—whether they are leading and their specificity regarding the alleged abuser and the acts alleged. *Ibid.*

D.R., Ms. McCabe, and Detective Hoffman gave fresh-complaint testimony. M.K.'s statement to D.R. that she had been raped is indisputably covered under the fresh-complaint rule because it was not preceded by questioning and met all the criteria for admissibility. It is, however, a close call whether M.K.'s statements to Ms. McCabe and Detective Hoffman have the necessary voluntariness to qualify as fresh complaint.

M.K. was not a young child. She was questioned several times by Detective Hoffman and Ms. McCabe before she stated she had been raped. Although it is clear that Ms. McCabe occupied a position of power in the Home, it is unclear whether she was a friendly house mother in whom the girls normally would confide or a stern disciplinary figure. Likewise, Detective Hoffman, a police officer, was an authoritarian figure, but it is unclear whether M.K. perceived him as a threatening cop or a helpful police officer.

In this case, the State presented little evidence other than fresh complaint testimony, so the evidence may have had a great impact. McCabe and Detective Hoffman were persons in authority whom jurors would respect and to whom they would listen. Instead of merely negating the inference that M.K. had not complained (achieved by D.R.'s fresh complaint testimony), the evidence could easily have served as the lynchpin of the prosecution's case. Accordingly, to be fair to the defendant and the victim, on remand the trial court at the new trial must consider whether Ms. McCabe's and Detective Hoffman's testimony is properly admissible as fresh-complaint evidence or

whether M.K.'s complaint to them was inadmissible under the fresh-complaint rule because it was elicited by coercive questioning.

### 3. Cumulative fresh complaint evidence

 The Appellate Division decided that the trial court had erred by admitting duplicative fresh-complaint evidence. We agree to the extent that the trial court should not have admitted evidence of a complaint extracted through coercive questioning. Yet this raises the issue of when otherwise admissible testimony regarding fresh-complaint evidence should be excluded because it is duplicative or prejudicial.

We have traditionally left it in the hands of the trial court to decide whether to limit or exclude witnesses. *See State v. Mucci*, 25 *N.J.* 423, 433, 136 *A.*2d 761 (1957) ("The question of limiting witnesses calls for the exercise of sound discretion in the context of the circumstances of the particular case. There can be no doubt as to the power of the trial judge to restrict the number of witnesses"). It would usurp the trial court's discretion to establish a blanket policy restricting testimony that fully qualifies for admissibility under the fresh-complaint rule but is duplicative or prejudicial.

In such cases, the trial court must first determine whether the testimony fulfills the requirements of the fresh-complaint rule. If so, then the trial court should assess, in light of the rule's narrow purpose of negating inferences that the victim had failed to complain, whether repeated testimony of the victim's complaint is irrelevant or prejudicial to the defendant.

There may be instances in which the trial court may find no prejudice from duplicative fresh-complaint testimony. That may occur when the victim complained at various times to different people, or when so much other evidence exists that duplicative testimony is unlikely to tip the scales. Yet, in close cases in which the victim's complaint has already been once established and it appears that repeated fresh-complaint testi-

mony would leave the jury with the impression that the State has gathered a greater number of witnesses than the defense, the trial court may properly exercise its discretion and exclude the testimony.

If the trial court determines that Ms. McCabe's and Detective Hoffman's testimony is admissible, then it will have to decide whether D.R.'s testimony had already established the fact of a complaint, whether the jury would find evidence of further complaints of any relevance, and whether in a close case like this one the testimony could prejudice defendant. In short, the court would need to weigh the probative value of the evidence against its potential prejudicial effects. We cannot establish a blanket rule because in each case the weight of each of those variables will be different.

### III

In summary, the fresh-complaint doctrine is rooted in sexist notions of how the "normal" woman responds to rape. We acknowledge the doctrine's misguided history and attempt to cure the defects underlying the rule that could infect rape proceedings with anti-female bias. Nonetheless, we conclude that women victims are better served by the continuance of the fresh-complaint doctrine than by its elimination. The present rule as designed neutralizes jurors' negative inferences concerning the woman's silence after having been raped.

To achieve a proper balance between victims' rights and defendants', we hold that to qualify as fresh complaint a victim's statements regarding the rape should not be extracted by coercive questioning. We leave it to the trial court to examine all the circumstances of the questioning to determine whether the line between coercive and benign questioning has been crossed. Likewise, the trial court in its discretion may, but need not, exclude cumulative fresh-complaint testimony that is prejudicial to defendant.

The judgment of the Appellate Division is affirmed and the matter remanded for further proceedings in accordance with this opinion.

*For affirmance and remandment—*

Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN–7.

Justice CLIFFORD concurs in the judgment.