# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3534-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

J.S.C.,

     Defendant-Appellant.

_____

Submitted September 13, 2018 – Decided February 27, 2019

Before Judges Koblitz and Ostrer.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 15-03-0792.

Jill R. Cohen, attorney for appellant.

Mary Eva Colalillo, Camden County Prosecutor, attorney for respondent (Jason Magid, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A Camden County indictment charged defendant J.S.C. (Jorge)[1] with second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1), of his estranged girlfriend M.D. (Maria) on two separate days. He allegedly assaulted her by vaginal penetration and anal penetration on May 6, 2014; and, four days later, by vaginal penetration. He also allegedly committed a terroristic threat, N.J.S.A. 2C:12-3. The jury found Jorge guilty of the anal penetration, and acquitted him of the two other sexual assault counts; and found him guilty of petty-disorderly-persons harassment, N.J.S.A. 2C:33-4(a), as a lesser-included offense of terroristic threats. On the sexual assault conviction, the court sentenced Jorge to a seven-year term of imprisonment, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, concurrent to thirty days on the harassment conviction. Appealing his conviction, Jorge contends his attorney was ineffective, and the court erred in admitting hearsay statements, and in failing to issue appropriate instructions to the jury. Having considered these arguments in light of the record and applicable legal principles, we affirm.

---

[1] We utilize initials and pseudonyms to protect the victim's privacy. See R. 1:38-3(c)(12).

I.

The State presented its case principally through the testimony of Maria; two co-workers who provided fresh-complaint testimony; and a sexual assault nurse examiner (SANE nurse). Jorge testified in his own defense. His mother and step-father testified in his defense as well. We glean the following facts from this record.

Maria and Jorge had an on-and-off relationship spanning five or six years. The two met in 2008 and had a daughter together in October 2011. In March 2012, after an eviction, they and their infant daughter moved into the home of Jorge's mother and step-father, P.R. (Patty) and A.R. (Arnaud). In February 2014, Jorge moved out, rekindling a relationship with a former girlfriend, but Maria and the child remained. A couple of months later he returned, but slept in a separate room. She told him that they were not together. Nevertheless, they started sleeping in the same room after a few days.

Maria testified that on May 6, 2014, after she exited the shower in the morning, wrapped only in a towel, Jorge repeatedly said he wanted to have sex, and Maria repeatedly refused. Significantly larger than she, Jorge pushed her on the bed, pinned her down, and digitally penetrated her anus. She cried quietly, begged him to stop, and tried to resist by moving and scratching him on

the neck. He removed his fingers, but then inserted his penis into her vagina and had "rough sex." Maria said she did not report the incident to Jorge's parents, or the police, because she was embarrassed, and scared about how Jorge would respond.

In pain, she dressed and went to work. A co-worker, J.L. (Jillian) noticed her discomfort and inquired if Jorge had hit her. Jillian testified that Maria nodded affirmatively in response. Later that night, Maria had dinner with a friend and co-worker, M.M. (Marcy) and confided in her that Jorge had assaulted her. When she returned home, Jorge gave Maria what she called an insincere apology.

Maria testified that three days later, she and Jorge argued about their relationship into the early morning hours of Saturday, May 10. After going to sleep in her clothes to discourage intimacy, she awoke in the middle of the night to find Jorge attempting to take off her pants. She objected, and he relented. But a couple hours later, he woke her again, and said he wanted to have sex. She objected, but he told her not to "make this any more difficult than it has to be," and she "didn't learn [her] lesson." He forcibly removed her pants, while she resisted, tearing at his shirt and crying. He told her that if she became loud, he would put a bullet in her head. Just five days earlier, he showed her a small

4

gun – she did not know it was a pellet gun – which he kept wrapped in a shirt on the nightstand. He then put his penis in her vagina without her consent. After he refused her entreaties to stop, she ceased resisting.

Maria testified that she and Jorge remained in the house until Jorge went shopping in the late afternoon. At that point, Maria told Arnaud that she could not remain in the household, and Jorge had raped her. Maria said that Arnaud told her it was her best opportunity to pack up, flee and get a restraining order. She then decided "to go to the hospital to get a rape kit done." At the hospital, she met the SANE nurse, told her the nature of the assaults, and submitted to the nurse's examination and sample gathering. Hospital staff alerted the police, who responded and eventually transported Maria to the stationhouse for an interview.

Jillian testified that Maria had called her Saturday afternoon and asked for help. Maria told her that "it happened again." Jillian asked Maria to elaborate. Maria filled in the details of the May 6 assault but Jillian did not repeat them for the jury. Jillian said she was horrified and did not ask Maria for details of the most recent assault. She told Maria to go to the hospital or call the police.

Marcy also testified and said Maria texted her on May 10, and asked her to meet at the hospital. She also testified about the report on May 6. Maria asked another friend to help retrieve the baby from Arnaud. The State elicited

evidence from Marcy and Jillian about Maria's demeanor in the hours after the two incidents, to support the allegation that she was victimized. The State also called the SANE nurse, and a forensic witness who confirmed that Jorge's DNA was found in vaginal and genital samples taken from Maria.

The defense's theory was that Maria had a history of false accusations; and she fabricated the story of sexual assault in order to exact revenge against Jorge for his infidelity, and to limit his access to their daughter. In cross-examining Maria, counsel elicited that Maria had obtained a temporary restraining order (TRO) against Jorge in 2011. Among other allegations, the domestic-violence complaint asserted that Jorge had pushed Maria down while she was pregnant. Maria explained that she was unaware that the allegation was included in the complaint and asked that it be corrected a couple days later because it was false. However, defense counsel also elicited from Maria's co-worker, Jillian, that Maria told her that Jorge had attacked her when she was pregnant.[2] In summation, counsel argued that this was evidence that Maria perpetuated the lie, and could not be trusted to tell the truth now.

---

[2] On direct, Marcy mentioned that Jorge had been violent with Maria while she was pregnant.

A-3534-16T1

Counsel also attempted to raise doubts about Maria's delay in reporting the May 6 incident, noting that Maria had friends and family in law enforcement, and was familiar with the process of seeking a restraining order, as she had done so in the past.

In his own defense, Jorge contended that the intercourse with Maria on May 6 and 10 was consensual. He contended that he told Maria he wanted to try something new, by digitally penetrating her anus, but stopped when Maria objected. He denied arguing with her on May 9. He agreed that their relationship was marked by repeated break-ups. He also described the events leading to the 2011 TRO, denying he shoved Maria.

Jorge's mother, Patty, testified that after Maria found out that Jorge had resumed a relationship with a former girlfriend, Maria said she was going to kill him. Jorge's step-father, Arnaud, testified that he recalled the same threat. However, both parents were confronted with the fact that they did not disclose the threat when police first questioned them. Arnaud also confirmed that Maria told him that Jorge had raped her on May 10, but he said he told her to go to the hospital only after she said her stomach hurt.

In its final instructions to the jury, the judge adhered to the model charge on fresh-complaint testimony, advising the jury that Jillian's and Marcy's

7

recounting of Maria's complaints was not substantive evidence the assaults occurred.  See Model Jury Charges (Criminal), "Fresh Complaint" (rev. Feb. 5, 2007).  The judge also addressed the issue of Maria's 2011 allegation that Jorge shoved her.  Although she introduced that section of her jury charge by stating, "[p]roof of other crimes, wrongs or acts," the judge explained that the defense "introduced evidence that in 2011 there was an alleged incident involving [Maria] and [Jorge]."  The court explained the defense did so "to challenge the credibility of [Maria]," and the jury should consider that evidence, along with other evidence, to determine whether the State has met its burden to prove the offenses charged.

## II.

Jorge presents the following points for our consideration:

> I.    [JORGE'S] PREVIOUS ATTORNEY WAS SO CONSTITUTIONALLY DEFICIENT AS TO DEPRIVE HIM OF DUE PROCESS (NOT RAISED BELOW).
>
> I(A) TRIAL COUNSEL SHOULD HAVE OBJECTED TO EVIDENCE OF ALLEGED PRIOR BAD ACTS ADMITTED THROUGH [MARCY] AND [JILLIAN'S] TESTIMONY AS THEY WERE CLEARLY VERY PREJUDICIAL TO HIS CLIENT.
>
> II.    [THE SANE NURSE'S] TESTIMONY WAS INADMISSIBLE HEARSAY BECAUSE THE

ONLY PURPOSE FOR [MARIA'S] VISIT TO THE HOSPITAL WAS TO PREPARE CRIMINAL ALLEGATIONS AGAINST [JORGE], NOT FOR THE PURPOSE OF DIAGNOSIS AND TREATMENT.

III. THE TRIAL COURT SHOULD HAVE LIMITED THE TESTIMONY OF PROMPT COMPLAINT WITNESSES [MARCY] AND [JILLIAN] SOLELY TO THE CONTENTS OF THE COMPLAINT, AN ERROR OF SUCH MAGNITUDE TO HAVE CAUSED AN INJUSTICE IN THE CASE.

IV. THE TRIAL COURT ERRED IN NOT ISSUING A PROMPT COMPLAINT INSTRUCTION, AND TRIAL COUNSEL ERRED IN NOT OBJECTING TO THE TESTIMONY OF [MARCY] AND [JILLIAN] WHICH FAR EXCEEDED THE SCOPE OF THE PROMPT COMPLAINT RULE (not raised below).

V. THE TRIAL COURT'S FAILURE TO GIVE CAUTIONARY INSTRUCTIONS AS TO THE USE OF PROMPT COMPLAINT EVIDENCE, AND ITS FAILURE TO USE THE APPROPRIATE 404(B) JURY INSTRUCTIONS WAS PLAIN ERROR (not raised below).

III.

A.

Defendant argues that his trial counsel was ineffective by eliciting testimony about the 2011 TRO; and not objecting to the admission of Maria's

9

hearsay statements to the SANE nurse, or to the testimony from Jillian and Marcy. We decline to decide the point. "Our courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992). At a PCR hearing, "counsel can explain the reasons for his conduct . . . and . . . the trial judge can rule upon the claims including the issue of prejudice." State v. Sparano, 249 N.J. Super. 411, 419 (App. Div. 1991). Even where a defense attorney conceded in his opening that his client was guilty of one or two counts of the indictment, the Supreme Court declined to reach the ineffective-assistance-of-counsel claim on direct appeal, because the concession may have been part of a strategy "to gain credibility with the jury in an attempt to earn a not guilty finding" on more serious charges. State v. Castagna, 187 N.J. 293, 316 (2006).

On this record, we are not prepared to conclude that defense counsel was ineffective. Eliciting testimony about the 2011 TRO was evidently part of a concerted strategy to undermine Maria's credibility. Counsel established the falsity of Maria's allegation in her 2011 domestic violence complaint that Jorge pushed her to the ground when pregnant. Although Maria contended the false

10

statement was unintentional and she corrected it, Maria apparently repeated the allegation to Marcy and Jillian.

Consistent with that strategy, defense counsel likely did not want to object to Marcy's and Jillian's testimony that Jorge had been violent with Maria in the past. As they did not testify they ever witnessed such violence, their statements could be viewed simply as evidence that Maria repeated falsehoods once again. The challenge to Maria's credibility, based on the 2011 false accusation, figured prominently in defense counsel's closing. Arguably, the strategy partly succeeded; in a case involving a credibility contest between Maria and Jorge, the jury rejected Maria's allegation regarding two out of the three assaults charged.

In sum, the ineffective-assistance-of-counsel claim is premature.

## B.

We turn next to the SANE nurse's testimony. The court permitted the nurse to recount Maria's assault complaints – but not statements casting blame on Jorge – and the nurse complied.[3] The State sought admission of the

---

[3] Usually, blame-casting statements are not relevant to diagnosis or treatment. See State v. McBride, 213 N.J. Super. 255, 273 (App. Div. 1986) (noting that statement casting blame on victim's husband was not covered by the exception). But see United States v. Renville, 779 F.2d 430, 437-38 (explaining that the

statements on two grounds: the statements were made for purposes of medical diagnosis or treatment under N.J.R.E. 803(c)(4); and they were relevant to establish the reason why the nurse gathered forensic samples where and how she did. As to the latter ground, the statements were ostensibly not admitted for the truth of the matter asserted. However, the court allowed the testimony without delivering a limiting instruction to the jury, either when the nurse testified or in the final jury charge. So, we may presume the jury considered the statements for the truth of the matters asserted. Consequently, the applicability of N.J.R.E. 803(c)(4) was essential to the statements' admissibility.

Defendant contends the court erred. His argument is a claim of plain error because his trial counsel conceded the statements were admissible to explain why the nurse gathered forensic samples, but did not request a limiting instruction. See State v. Frisby, 174 N.J. 583, 591 (2002) (considering the admission of unobjected-to hearsay under the plain-error standard). We consider whether the error was "of such a nature as to have been clearly capable of producing an unjust result." Ibid. (quoting R. 2:10-2). We review the trial

---

identity of a child abuser may be admissible under the analogous F.R.E. 803(4) if given for diagnostic or treatment purposes, such as in mental-health care or in determining whether the child's environment is safe from future abuse).

court's evidentiary ruling for an abuse of discretion, or a clear error of judgment. State v. Brown, 170 N.J. 138, 147 (2001).

The relevant hearsay exception allows a jury to consider the truth of out-of-court statements "made in good faith for purposes of medical diagnosis or treatment which describe medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof to the extent that the statements are reasonably pertinent to diagnosis or treatment."  N.J.R.E. 803(c)(4).

The critical issue here is Maria's motivation in seeking the examination, and providing the statements to the nurse; in other words, whether she did so "for purposes of medical diagnosis or treatment."  The question pertains to the fundamental justification for the hearsay exception.  It is assumed that persons will speak the truth to a physician or other medical provider because their successful treatment depends on it.  "[S]uch statements spring from natural reflexes and are made at a time when the desire for relief furnishes an impelling incentive for truth telling."  Cestaro v. Ferrara, 57 N.J. 497, 501 (1971); see also R.S. v. Knighton, 125 N.J. 79, 87 (1991) (explaining that statements made for purposes of treatment and diagnosis "possess inherent reliability" because effective treatment depends on the patient's accuracy in providing information).

13                                                          A-3534-16T1

However, the exception does not apply where the medical professional "was not 'consulted for purposes of treatment' but for gathering of evidence." State ex rel. C.A., 201 N.J. Super. 28, 33 (App. Div. 1985); see also State v. Pillar, 359 N.J. Super. 249, 289 (App. Div. 2003) (stating if a doctor's examination "was conducted for evidence gathering purposes," the hearsay statements in the medical history would be inadmissible under the exception). That is why the court must look to the subjective intent of the patient. "[T]o be admissible the patient must have believed that the statement would enable the doctor to treat." Id. at 33-34; see also Pillar, 359 N.J. Super. at 289 (considering the reason why the patient was referred to the physician). Thus, it is not dispositive that the SANE nurse testified that her exam was designed not only to gather evidence, but to ascertain whether physical or mental health treatment was warranted.

The State failed to meet its burden to establish the statements were made for purposes of diagnosis or treatment. See Pillar, 359 N.J. Super. at 289 (finding hearsay inadmissible under the exception because the State did not meet its burden); see also State v. James, 346 N.J. Super. 441, 457 (App. Div. 2002) (assigning to the hearsay's proponent the burden to establish the prerequisites of admissibility). Jillian testified that she told Maria "if she didn't feel comfortable

calling the police to get herself to the hospital . . . ." Maria testified that she went to the hospital "for a rape kit" – which is the collection of items and tools used to collect and preserve evidence of a sexual assault. She did not say she went for diagnosis or treatment, and she did not say she received any.[4]

Although the court erred, there was no plain error. In conveying Maria's hearsay statements, the nurse repeated, in dispassionate terms, basic facts related to the three acts of assault that Maria had already alleged in direct testimony. The nurse recounted that Maria told her about two incidents, days apart; she drew the nurse's attention to the rectal area regarding the initial incident; Maria said she had been restrained; and her attacker ejaculated. The nurse said the exam took less time than usual. Maria was cooperative, straightforward and direct; and she sometimes cried. Defense counsel waived cross-examination, indicating that counsel did not view the testimony as critical in bolstering Maria's credibility. See State v. Macon, 57 N.J. 325, 333 (1971) (stating that a

---

[4] We do not intend to suggest that statements to a SANE nurse are invariably inadmissible under N.J.R.E. 803(c)(4). Admissibility would seem to depend on the facts and circumstances of each case, to determine the declarant's good faith purpose in making the statements, and their reasonable pertinence to treatment and diagnosis. See Tracy A. Bateman, Admissibility of statements made for purposes of medical diagnosis or treatment as hearsay exception under Rule 803(4) of the Uniform Rules of Evidence, 38 A.L.R.5th 433, §§ 6[a] and 6[b] (2019) (reviewing cases of statements made to nurses that were found admissible and inadmissible).

court may infer that an "error was actually of no moment" in light of counsel's failure to object). Rather, defense counsel highlighted in closing the nurse's testimony that Maria was "exceedingly cooperative," which counsel asserted showed that Maria's goal was to "frame" Jorge and "manufacture evidence." In sum, the admission of the SANE nurse's testimony was not clearly capable of producing an unjust result.

## C.

Jorge contends that Maria's statements to Jillian should not have been admitted as fresh-complaint statements, because they responded to Jillian's questioning. He also contends that Maria's statements to Marcy exceeded the allowable scope of fresh-complaint testimony, except for a single unsolicited text from Maria to Marcy on May 10, asking Marcy to come to the hospital because "it happened again." Jorge also contends the court did not promptly instruct the jury. We are unpersuaded.

The fresh-complaint doctrine is a common law exception to the hearsay rule, designed to enable "the State to negate the inference that the victim was not sexually assaulted because of [the victim's] silence." State v. Hill, 121 N.J. 150, 163 (1990). It is admitted "to prove only that the alleged victim complained, not to corroborate the victim's allegations concerning the crime."

A-3534-16T1

State v. Bethune, 121 N.J. 137, 146 (1990). "Trial courts should instruct the jury of the limited role that fresh-compliant evidence should play in its consideration of the case." Id. at 148; see also State v. R.K., 220 N.J. 444, 456 (2015) (stating the charge is "required").

To offer a victim's statement under the rule, the State must establish three things: the statement was made "to someone [the victim] would ordinarily turn to for support"; it was "made within a reasonable time after the alleged assault"; and it was "spontaneous and voluntary." Hill, 121 N.J. at 163.[5] Also, to satisfy the rule, the victim must testify at trial. Ibid. Under the rule, only the general nature of the complaint may be conveyed. Ibid.; see also R.K., 220 N.J. at 456-57, 459-60 (concluding that a fresh-complaint witness provided excessive details, including by describing the defendant's ejaculate and conveying threats that the victim did not describe).

---

[5] In 1997, a Supreme Court committee recommended abolition of the fresh-complaint doctrine. State v. L.P., 352 N.J. Super. 369, 380 n.2 (App. Div. 2002). The Court did not adopt the recommendation. Ibid. In contrast, California has abolished the rule. Ibid. (citing People v. Brown, 883 P.2d 949 (Cal. 1994)). The California court observed that some of the underlying rationales of the doctrine had been eroded in modern society. Brown, 883 P.2d at 956-57. California "revis[ed] the contours of the doctrine to reflect more accurately the basis on which the admissibility of such evidence should be evaluated." Id. at 959. Admissibility would turn on "generally applicable evidentiary principles" instead of formal requirements such as voluntary spontaneity or freshness. Ibid.

17

On May 6, Maria conveyed to Jillian that Jorge had hit her only after Jillian noticed that Maria was in apparent pain, approached her, and asked her directly if he hit her. On May 10, Maria again responded to a question from Jillian, but this time, a more general one. On that day, Jillian testified that Maria called her, hysterical, and said she needed help. Jillian asked Maria to elaborate, and Maria told her that she had been sexually assaulted.

A fresh-complaint statement need not be entirely unprompted. "Courts have allowed fresh complaints made in response to general non-coercive questioning." Hill, 121 N.J. at 167. For example, a response to a question of what happened to a person in obvious distress, may be admissible. Ibid. "On the other hand, statements that are procured by pointed, inquisitive, coercive interrogation lack the degree of voluntariness necessary to qualify under the fresh-complaint rule." Ibid. The trial court must determine whether the questioning crossed the line, after considering facts such as the victim's age and relationship to the questioner; and the circumstances of the questioning, such as who asked what to whom and how. Ibid.

We recognize the court did not undertake this analysis. However, we are satisfied that despite Jillian's leading question on May 6, Maria's responses on both days were admissible. Jillian's questioning was not coercive, and

responded to Maria's apparent discomfort on May 6, and her hysteria and plea for help on May 10.

Marcy's statement of a fresh complaint about the May 6 incident did not raise similar issues. She stated she accompanied Maria on a walk after dinner. While they talked about Maria's desire to leave Jorge's parents' house, "she told me that what had happened with [Jorge] that morning, that he had forced himself on her." She added that "[Jorge] sexually forced himself onto [Maria]. It was unwanted. . . . He raped her."[6] We perceive no error, as Maria's statements to Marcy met the three prerequisites of the rule. Jorge does not challenge the admissibility of the text message that Maria sent to Marcy on May 10, stating that "it happened again." Marcy testified generally that "she meant that [Jorge] had sexually assaulted her again."

Jorge also argues that the court should have instructed the jury about the limited use of fresh-complaint testimony immediately after it was admitted. He does not allege the instruction, delivered in the final jury charge, was flawed.

We agree that the effectiveness of a limiting instruction is enhanced when it is delivered promptly. See State v. Herbert, ___ N.J. Super. ___, ___ (App.

---

[6] Marcy also said, "They were not in a sexual relationship at that time," which would not qualify under the fresh-complaint rule and obviously was based on Maria's hearsay statements.

A-3534-16T1

Div. 2019) (slip op. at 19) (stating that "a swift and firm instruction is better than a delayed one").  However, as there was no request for an immediate instruction, we consider this issue under the plain-error rule, see R.K., 220 N.J. at 456.

"Plain error is more likely to be found if there is any indication that jurors considered the fresh-complaint testimony for an improper purpose."  Ibid.  We discern no indication they did.  The State did not invite the jury to misuse the fresh-complaint testimony.

On the other hand, defense counsel challenged Maria's decision not to seek police intervention after May 6, raising the very issue that made fresh-complaint testimony relevant.  In sum, we are unconvinced that the delay in delivering the instruction was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached."  Macon, 57 N.J. at 336.

D.

Finally, we reject Jorge's contention that the trial court committed plain error by (1) permitting Jillian and Marcy to testify about other crimes and wrongs by Jorge, and (2) not delivering an appropriate jury instruction on the use of other crimes and wrongs evidence.  The defense strategy was to attack Maria's credibility by demonstrating that she falsely accused him of an assault

in 2011. Thus, the evidence was not elicited to establish that other crimes or wrongs even occurred. The model jury instruction for 404(b) evidence would have undermined the defense strategy, by focusing on the proper use of such other crimes evidence assuming it was true. See Model Jury Charges (Criminal), "Proof of Other Crimes, Wrongs, or Acts (N.J.R.E. 404(b))" (rev. Sept. 12, 2016). Specifically, the model charge states, "Before you can give any weight to this evidence, you must be satisfied that the defendant committed the other [crime, wrong or act]. If you are not so satisfied, you may not consider it for any purpose." However, the defense's argument was that defendant did not commit the other crime, wrong or act, and the jury should consider that fact in assessing Maria's credibility, because of her false accusation.

Jorge's remaining arguments, to the extent not addressed, lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3534-16T1