# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3162-16T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

G.L.,

    Defendant-Appellant,

_____

Submitted January 13, 2020 – Decided April 30, 2020

Before Judges Sumners and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 12-05-0354.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele Erica Friedman, Assistant Deputy Public Defender, of counsel and on the briefs).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Ali Y. Ozbek, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant was convicted of first-degree aggravated sexual assault of a child less than thirteen years old, N.J.S.A. 2C:14-2(a)(1); second-degree sexual assault of a child less than thirteen years old, N.J.S.A. 2C:14-2(b); first-degree aggravated sexual assault of a child between the ages of thirteen and sixteen years old, N.J.S.A. 2C:14-2(a); second-degree sexual assault of a child between the ages of thirteen and sixteen years old, N.J.S.A. 2C:14-2(c)(4); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a). After merger, defendant was sentenced to two consecutive fifteen-year prison terms subject to the No Early Release Act (NERA), NJSA 2C:43-7.2, concurrent to a seven-year prison term.

On appeal, defendant raises the following contentions:

> POINT I
>
> THE INTRODUCTION OF EXPERT TESTIMONY REGARDING CHILD SEXUAL ACCOMMODATION SYNDROME WAS BASED ON UNRELIABLE SCIENCE. THE JURY'S EXPOSURE TO THIS UNDULY PREJUDICIAL EVIDENCE WARRANTS REVERSAL OF G.L.'S CONVICTIONS.
>
> A. As Determined Pursuant to the Supreme Court's State v. J.L.G.[1] Remand Order, Evidence Concerning Child Sexual Assault Accommodation Syndrome Fails the Reliability Requirement Under N.J.R.E. 702.

---

[1] State v. J.L.G., 234 N.J. 265 (2018).

B. The CSAAS Testimony Should Have Also Been Excluded Under N.J.R.E. 702 Because the Jury Did Not Need Expert Testimony to Explain S.L.'s Proffered Explanation for Her Delayed Disclosure.

POINT II

THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO ADMIT EVIDENCE OF S.L.'S DISCLOSURE OF THE ALLEGED ABUSE TO B.W. UNDER THE FRESH COMPLAINT DOCTRINE, BECAUSE IT WAS NEITHER SPONTANEOUS NOR VOLUNTARY.

POINT III

THE PERVASIVE PROSECUTORIAL MISCONDUCT CONTAINED WITHIN THE STATE'S OPENING REMARKS RESULTED IN A MANIFEST INJUSTICE. FURTHER COMPOUNDING THE PREJUDICE STEMMING FROM THE PROSECUTORIAL ERRORS, THE COURT ISSUED AN INADEQUATE AND ERRONEOUS INSTRUCTION IN RESPONSE TO THAT MISCONDUCT. (Partially Raised Below).

A. The State Committed Prosecutorial Misconduct by Appealing to the Jury's Emotions and Vouching for B.W.'s Credibility. Because this Prosecutorial Misconduct Deprived G. L. of a Fair Trial and Constituted a Manifest Injustice, the Court Committed Reversible Error in Refusing to Grant a Mistrial.

i. The Prosecutor Impermissibly Portrayed S.L. as a "Defenseless" Victim, Whose Father Abandoned His Paternal Duties Towards Her, and Instead, Used Her as a "Sex Object."

3

ii. The Prosecutor Impermissibly Vouched for B.W.'s Credibility as a Witness.

iii. The Court Committed Reversible Error When Refusing to Grant the Defense's Motion for a Mistrial Based on the Prosecutorial Misconduct.

B. The Court Erroneously Instructed the Jury Only to Disregard the Prosecutor's Improper Remarks Until All the Evidence Had Been Presented.

POINT IV

THE COURT COMMITTED REVERSIBLE ERROR WHEN PERMITTING THE STATE TO INTRODUCE A PHOTOGRAPH OF S.L. WHEN SHE WAS 13 YEARS OLD.

POINT V

THE SENTENCING COURT PENALIZED G.L. FOR ACTS EXCEEDING THE CRIMES FOR WHICH HE WAS CONVICTED, AND FAILED TO CONSIDER NERA'S REAL-TIME CONSEQUENCES. IN ADDITION, THE ORAL SENTENCE DOES NOT MATCH THE JUDGMENT OF CONVICTION.

A. The Court's Finding of Aggravating Factor One Improperly Penalized G.L. for Conduct Beyond That for Which He was Convicted.

B. G.L.'s Sentence Should be Reduced Given NERA's Real-Time Consequences.

C. The Oral Sentence Does Not Comport with the Judgment of Conviction.

For the following reasons, we affirm the convictions and sentences, but without objection from the State, remand for correction of defendant's judgment of conviction (JOC) to comport with the sentences ordered by the trial judge.

I.

Relevant to defendant's contentions on appeal, we discuss the trial testimony, pretrial motions, the State's opening statement, and sentencing.

Trial Testimony

Trial was conducted by Judge Marybel Mercado-Ramirez from July 14 to 29, 2016. S.L. (Sofia),[2] then almost nineteen years old, testified she was repeatedly sexually assaulted by defendant, her father, over the course of two years beginning in 2009 when she was twelve years old. Sofia and her twin brother, Steve, were seven-years old when they moved to New Jersey from Jamaica in 2004. Upon arrival, they lived with defendant, their stepmother, and their younger sister.[3]

At some point after September 2009, Sofia, her brother, and defendant moved away from her stepmother and sister after defendant and her stepmother

_____

[2]  We use pseudonyms to protect the privacy of the child victim, family members, and witnesses. R. 1:38-3(c)(9).

[3]  Sofia's testimony refers to her younger sister as both a half-sister and a stepsister. Due to this uncertainty, we refer to her as "sister."

divorced. In their new two-bedroom attic space, Sofia and Steve shared a bedroom. Sofia testified while she was sleeping one night, she awoke to find defendant on top of her. She claimed defendant grabbed her hands and had sexual intercourse with her. She stated defendant continued to have intercourse with her about every week or every other week at that home and other multiple residences they lived in until Sofia was at least fourteen years old.

Sofia recalled when she was thirteen years old, they moved to her godfather D.W.'s (Dean's) one-bedroom apartment. Dean's girlfriend B.W. (Barb) would visit often and formed a bond with Sofia. Barb testified she would purchase "important stuff" for Sofia "like ladies['] napkins . . . deodorant, [and] underwear[,]" and she became a mother figure for Sofia, who called her "mom."

Sometime in November 2011, when Sofia was fourteen years old, and after her family moved out of Dean's home, she disclosed to Barb that she was being "molested" by defendant. Sofia testified she told Barb about the abuse because she "was tired of it" and "finally found someone [she] trusted." While she had known Barb for a while and had a "bond" with her previously, Sofia said she waited until that day because "even though we had a bond, it wasn't a strong . . . bond and I wasn't sure like if I could really trust her with the situation, and I wasn't sure what was going to happen." When asked if there was any reason

6

why she never told anyone sooner, Sofia replied on direct examination "[b]ecause [defendant] threatened me and also because I didn't really trust anyone to tell." Sofia testified she believed defendant would kill her if she told anyone because she had once found a gun in his pants pocket when she was twelve. Her cross-examination was unremarkable.

Barb testified she did not call the police immediately because she was in shock and did not know what to do. Later that day, Barb told Dean and her stepmother who advised her to call the police, but she did not because she was still in shock. Barb's stepmother instead notified police about the allegations the following day.

After the police were notified, Sofia was taken to a hospital, but she was not given a forensic exam because it had been longer than five days since the last alleged sexual assault occurred. After leaving the hospital, Sofia was taken to the Passaic County Prosecutor's Office (PCPO), where she provided a statement to Detective Michael Boone, who testified for the State.

About five days after taking Sofia's statements, Boone located defendant at his ex-wife's home. He was not arrested but was taken to the PCPO for questioning. Defendant initially denied knowing why he was brought in for questioning and denied touching Sofia inappropriately when confronted with her

accusations. However, after being pressed on the matter defendant confessed to having sex with Sofia and accused her of seducing him. Defendant's video recorded statement included the following colloquy:

> DET. BOONE: I'm telling you that your daughter said that you had sex with her, that you put your penis in her vagina, you had sexual intercourse with your daughter. That's what she's saying, okay? In a nutshell, that's what she said. Is your daughter lying? Now, she's not lying, is she? No?
>
> [Defendant]: She not lying.
>
> . . . .
>
> [Defendant]: The reason why it happened, she's the one who made me do it. That I know.
>
> . . . .
>
> [Defendant]: She come in my room when I'm sleeping. And she come in my room. The first time she do it, I ask her what she doing. I said what you doing?
>
> . . . .
>
> [Defendant]: [Sofia] [g]ot into my bed and she back up on me and I ask her what she doing. She say nothing. So the first time, I – I get up and I asked her – and I asked her how – why did you do that? She said nothing.

Defendant told Boone he did not have intercourse with Sofia that night, but she came to his bed another time kicking and touching him. He stated she would rub on him but denied having intercourse with her. Defendant's

A-3162-16T1

equivocation continued by admitting he had intercourse with Sofia, then claiming he only digitally penetrated her. He denied ever threatening Sofia with violence if she told anyone about the abuse.

The State also presented the testimony of Dr. Anthony D'Urso, a clinical psychologist, as an expert regarding Child Sexual Assault Accommodation Syndrome (CSAAS). Dr. D'Urso did not know the specific facts of the case, nor had he ever met Sofia, stating "the purpose of [his] testimony [was] to provide education and backdrop about child sexual assault – and to lay a context for understanding the differences that children who are assaulted have say relative to adults."

Dr. D'Urso gave an overview of the five elements of CSAAS. Regarding the first element, "secrecy," Dr. D'Urso testified that typically children delay disclosure of abuse and do not tell anyone after they've been violated for the first time. Regarding the second element, "helplessness," he stated it relates to personal and emotional factors which inhibit a child victim from disclosing their abuse. He stated the third element "entrapment and accommodation," really encompassed "coercion" as well, and that children can feel trapped in the cycle of abuse if it started off as less sinister acts such as tickling or wrestling, and that the victim's relationship with the abuser can also serve to entrap them. The

fourth element, "delayed disclosure," meant that children are not always ready to tell everyone everything about the abuse within a short period of time, and the whole story usually comes out over a longer period of time. According to the doctor, the fifth element "retraction" related to children feeling unsupported after their disclosure which sometimes causes them to recant or minimize their initial allegations.

Dr. D'Urso concluded by stating CSAAS was not a diagnostic tool and could not be applied to determine if sexual assault did in fact occur.

Defendant neither testified nor presented any witnesses on his behalf.

<u>Pretrial Motions</u>

Before trial, Judge Mercado-Ramirez held a hearing to address the State's motion to admit into evidence as a fresh complaint, Barb's testimony regarding Sofia's disclosure of the alleged abuse, and a photo depicting a thirteen-year-old Sofia.

Barb testified to her mother-figure relationship with Sofia, and her accusations against her father. She stated:

> I was in the living room – in the kitchen and [Sofia]
> said to me, mom, I have something to tell you, but I
> cannot tell you until I'm age [eighteen].

So, you know, as a mother I try to press her and I said, [w]hats [w]rong? She said, no, she can't tell me until she's [eighteen] years old.

Barb recalled telling Sofia, "[i]f you don't tell me, I'm not going to be your friend; I'm not going to talk to you no more[,]" before she proceeded to the bedroom. Sofia followed her into the bedroom "a minute or two" afterward. Barb then stated:

So I stepped off and I went into my bedroom. I was laying on the bed. She came in there. So as a mother, I said, [Sofia], I said, what is it? You know, try to – what it is? Please tell me what it is. So I said to her, [Sofia], [Dean] molesting you? [Dean] is my fiancé. She said, Mom, no. I asked her, [Sofia], is your father molesting you? She never answer. I ask her a second time. She never answer. I asked her a third time and she said, [y]es, Mom, and she went down on my shoulder and we both started to cry.

Barb testified she asked Sofia why she did not tell her about the abuse sooner, and Sofia told her that she just couldn't tell her. Barb stated she inquired about Dean and defendant molesting Sofia because they were the men Sofia was around at the time, and Sofia had "changed." She testified that Sofia's stomach and breasts looked big and that she might be pregnant, Sofia developed fast, and Barb had been around kids that have been molested and that "they develop so fast."

11

In allowing Barb's testimony as a fresh complaint, the judge issued a written decision reasoning that Sofia's disclosure was not due to "coercive questioning but questioning fashioned to elicit the truth from a child who was scared and 'reluctant to disclose the abuse.'" Citing State v. Bethune, 121 N.J. 137 (1990), the judge noted at the time of disclosure Sofia was still living with defendant and was completely dependent on him. The judge wrote:

> [A]lthough the complete disclosure was not totally volunteered but the product of some questioning, for the same reasons, I find that it makes [Sofia's] disclosure no less voluntary or spontaneous. "More latitude" is appropriate in "the type and extent of questioning" which may precede the fresh complaint of a juvenile victim. [State v. ]Hill[, 121 N.J. 150 (1990)]. Statements made after general non-coercive questioning still possess "the necessary spontaneity and voluntariness" to qualify as fresh complaints. [Ibid.]
>
> At arriving at this decision[,] this [c]ourt finds [Barb] credible. She appeared in court well-groomed and appropriately dressed for a court hearing. [Barb] was well spoken, knowledgeable, direct and clear in her responses . . . .

At another pretrial hearing, the State moved to admit into evidence a photograph of thirteen-year-old Sofia. Defendant opposed, arguing the photo's purpose was intended to inflame the jury's passion. The State rebutted that it was a "simple photo" and would allow the jury to see what Sofia looked like at the time of the sexual assault "especially in light of the fact that [Sofia] is now

12

an adult and looks very different." Sofia was almost nineteen years old at the time of trial. In admitting the photo, the judge stated: "There's nothing in the photograph that is intended to immediately evoke emotion from a jury, but it simply shows approximately . . . what she looked like at the time of the alleged sexual abuse . . . ."

The State's Opening

The prosecutor began her opening, remarking:

> [Sofia] was a motherless child, a child who came from Jamaica with her twin brother at the tender age of seven. She was a motherless child. She depended on her father. He was her only parent and full caretaker, and she loved him very much, until one day things changed, until one day her father divorced his wife, until one day after moved her and her brother to a new home, until one day her father began to have sex with her.
>
> Ladies and gentlemen, her absent mother and his absent wife gave him access, opportunity, and ability to destroy his own daughter's innocence and turn her into − [.]

The defense objected before the prosecutor could complete her sentence, resulting in the jury's removal from the courtroom in order to resolve defendant's application for mistrial. Defendant argued a mistrial was warranted because the comments that Sofia was "motherless" and had an "absent mother" were inappropriate for an opening and being used to "inflame the passions of [the]

13

jury." The State responded the remarks were based on facts to be adduced from testimony and supported their prosecution theme.

Judge Mercado-Ramirez denied defendant's motion stating: "I understand . . . there's certain terminology [the prosecutor] is using, but she is giving the theory of her case to the jury. She is providing the victim's background in this case. Again, all of that is going to be brought out before the jury . . . through admissible evidence." The judge also asked defendant to refrain from making any further objections until the State concluded its opening.

When the jury returned, the prosecutor proceeded, stating:

> Her absent mother and his absent wife gave him the opportunity, access, and the ability to destroy his own daughter's innocence and turn her into a sexual object to satisfy his sexual urges whenever he wanted sex.
>
> Ladies and gentlemen, [Sofia] was a motherless child. She was his daughter. He was supposed to protect her and nurture her, not violate her. But she was vulnerable. She was defenseless.

The judge then halted the proceedings and asked counsel for both parties to approach the bench for a side bar. The judge explained to the prosecutor that her remarks were more suited for closing, she needed to lay out what she intended to prove, "what the elements of the offense are, what happened, and save those conclusory arguments for closing."

The prosecutor then continued:

> Ladies and gentlemen, imagine her reality. That was [Sofia's] reality.
>
> You will hear testimony that [defendant] sexually assaulted his daughter from the time she was [twelve] years old until she was [fourteen] years of age and that he did so repeatedly and in multiple residences in this very town of Paterson.
>
> And who could [Sofia] turn to? Who could protect her? All she had was her twin brother, a child just like her, and her father, the very person who was violating her. That's who she had, until one day [Sofia] met [Barb]. a sweet and loving woman who [Sofia] immediately gravitated to, a woman who [Sofia] began to call, "Mom[.]"
>
> Thank goodness for [Barb]. She'll testify at this trial and she will tell you that on Wednesday, November 9th, 2011, [Sofia] confided in her and told her that her father had been sexually abusing her. She will tell you she did not know what to do. And you will learn that the very next day [Barb's] stepmother contacted the police and an investigation ensued.

At the end of the prosecutor's opening, defense counsel approached the sidebar, again moving for mistrial. The jury was again removed from the courtroom. Defense counsel argued that considering the judge's initial concerns about the prosecutor's statements, a mistrial was even more appropriate because of the prosecutor's additional statements that the absence of Sofia's mother and step-mother gave defendant the opportunity to turn Sofia into a sexual object to

15

satisfy defendant's desires, that defendant was supposed to protect and nurture Sofia, that Sofia was vulnerable and defenseless, and that Barb was a sweet and loving woman.

Again, the judge refused to declare a mistrial. Though finding the comments were "clearly better suited for closing arguments," the judge found they did not "rise to the level where a defendant is prejudiced in that if some of these comments are untrue and not brought out during that State's case or borne out by the evidence, defense counsel will certainly have the opportunity to point them out to the jury at the end of the case." The judge instead opted for a curative instruction.

When the jury returned to the courtroom, the judge gave the following instruction:

> I just want to note for you that certain statements were made by the State during opening remarks in relation to [Sofia's] innocence, vulnerability, sexual objectify [sic] and having – objectivity and not having any – or the lack of protection.
>
> I just want to note and advise you that the comments are more appropriate for closing remarks and not appropriate at this juncture in the case because the witnesses have yet to testify, so, as a result of that, I'm going to instruct you to please disregard them until all the evidence has been presented.

At the trial's conclusion, the jury returned guilty verdicts on two counts of aggravated sexual assault upon Sofia by committing sexual penetration when she was less than thirteen years old and committing sexual penetration when she was between thirteen and sixteen years old and being related by blood; and two counts of sexual assault upon Sofia by committing sexual contact when she was less than thirteen years old and committing sexual penetration when she was between thirteen and sixteen years old; and one count of endangering the welfare of a child.

Sentencing

On December 16, 2016, Judge Mercado-Ramirez merged the sexual assault convictions with the aggravated sexual assault convictions. The JOC reflects defendant's convictions for sexual assault of a victim under thirteen years old and aggravated sexual assault of a victim between the ages of thirteen and sixteen were merged into his conviction for aggravated sexual assault of a victim under thirteen years old. It shows defendant was given sentences for aggravated sexual assault of a victim under thirteen years old, sexual assault of a person between thirteen and fifteen years old and endangering the welfare of a child.

17

The JOC does not comport with the sentence the judge placed on the record for the two aggravated sexual assault counts and the endangerment count. Despite defense counsel asking the judge to sentence defendant to concurrent sentences considering the consequences of NERA, on the first aggravated sexual assault charge the judge sentenced defendant to fifteen years imprisonment pursuant to NERA, Megan's Law,[4] parole supervision for life and five years of parole supervision to be served separate and apart from his parole supervision once released from custody. On the second aggravated sexual assault charge the judge sentenced defendant to fifteen years imprisonment, to run consecutively with the first charge, Megan's Law, parole supervision for life, as well as five years parole supervision separate and apart to run consecutively with the first charge. On the child endangerment charge the judge sentenced defendant to seven years imprisonment to run concurrent with his thirty-year sentence under aggravated sexual assault charges.

In discussing the aggravating and mitigating factors, the judge stated:

> The [c]ourt finds that . . . [a]ggravating [f]actor [one][5] does in fact apply to this case. . . . I would note that it . . . goes directly to [c]ounts of [aggravated sexual assault (two), sexual assault] . . . only. Case law is

---

[4] N.J.S.A. 2C:7-1 to -23

[5] N.J.S.A. 2C:44-1(a)(1) – the nature and circumstances of the offense.

clear. It indicates that the first instance of sexual assault is sufficient, and here sexual abuse by way of penetration . . . is sufficient to satisfy the elements of the offense and anything thereafter can be considered as part of this aggravating factor.

There's no doubt that there was sexual abuse that happened at least form the age of . . . [twelve] until right before she turned [thirteen]. There's no dispute that each act of sexual penetration of a young child by her father is in fact heinous, and cruel, and depraved.

The judge went on to detail the abuse, noting that it began when Sofia was twelve, when she was in the safety of her own bed. The judge noted defendant violated Sofia's trust, that he is a big muscular man, and that at the time of the abuse he was in his thirties. The judge also took into consideration aggravating factors two, three, four, and nine, and mitigating factor seven. N.J.S.A. 2C:44-1(a)(2) (gravity of harm inflicted on victim); -1(a)(3) (the risk of re-offense); -1(a)(4) (breach of a fiduciary responsibility); -1(a)(9) (need to deter defendant and others from violating the law); and -1(b)(7) (lack of criminal record).

## II.

We first address defendant's contention in Point I, raised for the first time on appeal, that based upon the Supreme Court's ruling in J.L.G., approximately two years after his trial, his conviction should be overturned because the judge erred in admitting CSAAS testimony. In particular, defendant contends the

CSAAS testimony violated his due process rights to a fair trial because it was unnecessary to explain Sofia's delayed disclosure of abuse and it unfairly bolstered the State's case. He also maintains the testimony did not qualify as expert testimony under N.J.R.E. 702.[6]

Because no objection was made at trial to the CSAAS testimony, we review defendant's challenge for plain error. Under the plain error standard, we disregard any error or omission by the trial court "unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ." R. 2:10-2; see also State v. Santamaria, 236 N.J. 390, 404 (2019). "To warrant reversal[,] . . . an error at trial must be sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).

During the pendency of this appeal, our Supreme Court decided J.L.G., where it partially overturned its holding in State v. J.Q., 130 N.J. 554 (1993). The Court held:

---

[6] N.J.R.E. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

Based on what is known today, it is no longer possible to conclude that CSAAS has a sufficiently reliable basis in science to be the subject of expert testimony. We find continued scientific support for only one aspect of the theory — delayed disclosure — because scientists generally accept that a significant percentage of children delay reporting sexual abuse.

We therefore hold that expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted at criminal trials. Evidence about delayed disclosure can be presented if it satisfies all parts of the applicable evidence rule. In particular, the State must show that the evidence is beyond the understanding of the average juror.

[J.L.G., 234 N.J. at 272 (citing N.J.R.E. 702).]

The Court recognized the limited admissibility of CSAAS expert testimony "will turn on the facts of each case." Ibid. Thus, when a victim gives "straightforward reasons about why [he or] she delayed reporting abuse, the jury [does] not need help from an expert to evaluate [his or] her explanation. However, if a child cannot offer a rational explanation, expert testimony may help the jury understand the witness's behavior." Ibid. Although J.L.G. permits expert testimony about delayed disclosure or causes for delayed disclosure; "[t]he testimony should not stray from explaining that delayed disclosure commonly occurs among victims of child sexual abuse, and offering a basis for that conclusion." Id. at 303. The Court recognized CSAAS evidence was still

considered reliable and accepted by the scientific community to explain delayed disclosure of sexual abuse and could therefore be used to explain that aspect of a case in the absence of other evidence. Id. at 272. The Court further explained:

> Whether a victim's delayed disclosure is beyond the ken of the average juror will depend on the facts of the case. If a child witness cannot offer a rational explanation for the delay in disclosing abuse -- which may happen during the pretrial investigative phase or on the witness stand -- expert evidence may be admitted to help the jury understand the child's behavior.
>
> [Id. at 305 (internal citation omitted).]

The Court also added that "a young teenager's explanation from the witness stand may fall within the ken of the average juror and might be assessed without expert testimony." Ibid. Admissibility of CSAAS expert testimony, nevertheless, may be harmless "in light of the overwhelming evidence of [a] defendant's guilt." Id. at 306.

Because the J.L.G. Court did not opine with respect to whether its holding applied retroactively, we directly addressed the issue in State v. G.E.P., 458 N.J. Super. 436 (2019). There, we held the J.L.G. holding "should be given at least pipeline retroactivity," rendering it applicable to all cases in which the parties have not exhausted all avenues of direct review when the Court issued its opinion in J.L.G. G.E.P. 458 N.J. Super. at 448. Because defendant's appeal

22

was pending during the Court's consideration of J.L.G., its holding applies to defendant's appeal.

Applying J.L.G., we conclude the admission of Dr. D'Urso's CSAAS testimony was harmless and does not warrant vacation of defendant's conviction. Sofia was nearly nineteen years old when she testified, thus it was not necessary for Dr. D'Urso to testify to the CSAAS element regarding delayed disclosure of child sex abuse victims. Sofia's explanation that she delayed reporting the abuse "[b]ecause [defendant] threatened [her] and also because [she] didn't really trust anyone to tell," was something the average juror could understand. See State v. Reeds, 197 N.J. 280, 290 (2009) (holding expert "testimony concerns a subject matter beyond the ken of an average juror") (citing N.J.R.E. 702). Nonetheless, Sofia's credibility was uncontroverted save for defendant's initial statement of denial to investigators, which he recanted by admitting to having sex with Sofia because she seduced him. Hence, the presentation of Dr. D'Urso's CSAAS testimony was insufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.

### III.

Defendant argues in Point II that Judge Mercado-Ramirez should not have granted the State's request to admit, as fresh complaint evidence, Sofia's

disclosure to Barb of defendant's alleged sexual abuse because the disclosure was involuntary and coerced by Barb's pointed questions. Defendant cites to Hill, 121 N.J. at 167, which held an allegation of sex abuse generated by a "pointed, inquisitive, coercive interrogation [that] lack[ed] the degree of voluntariness" is not admissible as a fresh complaint. He points to Barb's candid testimony at the pretrial motion hearing, admitting she "press[ed]" Sofia to disclose the sex abuse allegation which Sofia clearly indicated she did not feel comfortable providing until she was older. According to defendant, Sofia's disclosure to Barb casted doubt on the reliability of her trial testimony regarding the alleged sex acts. He moreover contends admission of both Barb and Sofia's testimony regarding the disclosure amounted to cumulative fresh complaint evidence improperly bolstering Sofia's credibility.

Judge Mercado-Ramirez did not abuse her discretion by allowing as a fresh complaint, both Sofia and Barb to testify regarding Sofia's complaint. See State v. Cope, 224 N.J. 530, 554-55 (2016) (recognizing trial judges retain broad discretion in determining the admissibility of evidence); Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) ("[W]e will reverse an evidentiary ruling only if it 'was so wide [of] the mark that a manifest denial of justice resulted.'") (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)). Their

testimony met the criteria for admission. The fresh complaint doctrine allows the State to admit "evidence of a victim's complaint of sexual abuse, [which is] otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." State v. R.K., 220 N.J. 444, 455 (2015) (citing Hill, 121 N.J. at 163, State v. Balles, 47 N.J. 331, 338 (1966)).

We agree with defendant there should not be a "pointed, inquisitive, coercive interrogation" because it undermines the voluntariness of the disclosure. Hill, 121 N.J. at 167. "The line, however, between non-coercive questioning and coercive questioning depends on the circumstances of the interrogation." Ibid. Therefore, the trial judge should consider the following factors when making such a determination:

> [T]he age of the victim; the circumstances under which the interrogation takes place; the victim's relationship with the interrogator, i.e., relative, friend, professional counselor, or authoritarian figure; who initiated the discussion; the type of questions asked—whether they are leading and their specificity regarding the alleged abuser and the acts alleged.
>
> [Id. at 168.]

Sofia and Barb's testimony clearly shows their relationship was friendly and caring, and Sofia stated she finally found someone she felt she could trust

with the information about being sexually assaulted. Barb's repeated questioning of Sofia was appropriate given their relationship and the circumstance. Evidencing the mother-figure bond Barb had with Sofia and the absence of targeting defendant, is that her pointed questioning to Sofia first inquired if her own husband was a possible abuser. They both provided enough information to explain the context of Sofia's complaint, and neither witnesses' testimony was "excessively graphic" or more detailed than Sofia's own testimony. See R.K., 220 N.J. at 459 (holding a fresh complaint witness's testimony inadmissible because it was "excessively graphic" and went beyond the scope of the victim's testimony). Additionally, any argument the fresh complaint evidence was cumulative because both Sofia and Barb testified lacks merit. Fresh complaint testimony is only cumulative if two or more people testify to the victim's disclosure, not the victim and the confidante. Hill 121 N.J. at 169-70.

## IV.

In Point III, defendant argues the prosecutor committed misconduct during opening remarks by purposefully inflaming the passions of the jury and vouching for the credibility of Barb, which diverted the jurors from their fact-finding function. Citing State v. W.L., 292 N.J. Super. 100, 111 (1996) and

State v. Blakney, 189 N.J. 88, 96 (2006), defendant asserts the prosecutor inflamed the jury's passions by arguing defendant breached his duty to protect his "defenseless," "vulnerable," and "innocent" daughter by using her as a sexual "object," and that a prosecutor's emotional arguments designed to dislodge logic as the prime arbiter of the facts are forbidden. The comments, defendant emphasizes, must be considered with the prosecutor's reference to Sofia as a "motherless child" three times and having an "absent mother" twice during opening statements. Defendant further asserts the issue was not cured by the court's subsequent instruction to the jury, and the court should have granted a mistrial. Further, relying on State v. Marshall, 123 N.J. 1, 154-156 (1991) and State v. Farrell, 61 N.J. 99, 105 (1972), defendant avows the prosecutor committed misconduct by bolstering Barb's credibility as a witness by stating she was a "sweet," "loving," and nearly heavenly woman.

We agree, as did Judge Mercado-Ramirez, that the prosecutor's remarks in question were better left unsaid because they were inappropriate for an opening statement. Yet, when viewing the remarks in the context of the entire trial, we do not conclude that they so infected the proceedings as to deprive defendant of a fair hearing so that his conviction should be reversed.

"The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court, which should grant a mistrial only to prevent an obvious failure of justice." State v. Harvey, 151 N.J. 117, 205 (1997) (citations omitted). Whether a prejudicial remark can be defused by a curative instruction or warrants a mistrial is left to the trial judge's competence. State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Winter, 96 N.J. 640, 646-47 (1953)). We will not disturb a trial judge's "denial of a mistrial motion absent a 'clear showing' that 'the defendant suffered actual harm' or that the court otherwise 'abused its discretion.'" Ibid. (quoting State v. Labrutto, 114 N.J. 187, 207 (1989)). Moreover, "when inadmissible evidence erroneously comes before the jury, an appellate court should not order a new trial unless the error was 'clearly capable of producing an unjust result.'" Id. at 397-98 (citing R. 2:10-2; State v. Frisby, 174 N.J. 583, 591 (2002)).

In evaluating claims of prosecutorial misconduct, we consider: "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." State v. Frost, 158 N.J. 76, 83 (1999). We must further assess "the severity of the misconduct and its prejudicial effect on the defendant's right

to a fair trial." State v. Timmendequas, 161 N.J. 515, 575 (1999). In doing so, we "consider the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred." Ibid. When making opening statements, "prosecutors should limit comments . . . to the facts [they] intend[] in good faith to prove by competent evidence[.]" Id. at 360 (alterations in original) (internal quotation marks omitted). Because "[t]he purpose of a prosecutor's opening statement is to present to the jury an outline or summary of what the State expects to prove[,] [p]rosecutors should limit themselves in their openings to what they will prove and not 'anticipate' their 'final argument.'" W.L., 292 N.J. Super. at 108 (quoting State v. Ernst, 32 N.J. 567, 577 (1960)). Prosecutors are prohibited from suggesting in their opening statements that they know of reasons beyond the evidence why the jury should reach a certain verdict. See State v. Wakefield, 190 N.J. 397, 438-40 (2007).

Here, defendant objected to the prosecutor's improper remarks, and the judge properly directed the prosecutor to refrain from making such comments during her opening. Despite the prosecutor's failure to abide by the judge's initial warnings, rather than grant the mistrial sought by defendant, the judge appropriately gave curative instructions to the jury to disregard the challenged remarks. The judge informed the jury the remarks were inappropriate for being

29

argumentative and directed they should only be considered after hearing all the evidence presented during the trial. At the close of the trial, the prosecutor's closing remarks were consistent with the curative instructions the judge provided. Moreover, the judge gave the jury preliminary and final instructions that the attorney's comments were not evidence. See Id. at 440. We discern no abuse of discretion in the judge's decision not to grant the mistrial defendant sought. The jury is presumed to have followed the court's instructions. State v. Smith, 212 N.J. 365, 409 (2012).

Defendant's contentions that the curative instruction was flawed, and the prosecutor's remarks bolstered the credibility of Barb, were not made known to the judge. Thus, in considering the contentions under our plain error rule no unjust result occurred depriving defendant of a fair trial. See R. 2:10-2. The instruction given by the judge was an appropriate direction to the jury to remedy the prosecutor's remarks. As for the comments that Barb was "sweet" and "loving," they were premature for opening remarks, but the prosecutor was not personally vouching for her credibility. See State v. Walden, 370 N.J. Super. 549, 560 (App. Div. 2004).

V.

In Point IV, defendant maintains Judge Mercado-Ramirez erred in admitting into evidence Sofia's photo as a thirteen-year-old because under N.J.R.E. 403, it had no probative value given there was no dispute she lacked consensual age to have sex when she was allegedly abused and it was prejudicial because it depicted her as a young teen. Defendant argues reversal of his conviction is warranted because the picture's "inherently inflammatory potential . . . [had the] probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue[s]." State v. Thompson, 59 N.J. 396, 421 (1971).

We discern no abuse of discretion in the judge's evidentiary ruling. The photo was probative because it showed Sofia during the time period she claimed she was victimized by her father. Even though there was no dispute she was underage at that time, the State has the right to prove an element of the crimes as well as providing the jurors an image of Sofia then, as opposed to the nearly nineteen-year-old young woman providing testimony before them. Besides depicting her age, there is nothing suggestive or excessively sympathetic in the photo. Therefore, the potential for prejudice did not outweigh the photograph's probative worth.

## VI.

Finally, in Point V, defendant argues his sentences are excessive due to the judge's application of aggravating factor one and imposing consecutive NERA sentences without considering the real time consequences of his prison term. Defendant's sentencing arguments are without sufficient merit to warrant much discussion. R. 2:11-3(e)(2).

Defendant exploited his parental authority and repeatedly sexually abused his daughter over a two-year period, beginning when she was twelve years old. We cannot conclude his aggregate thirty-year prison term, subject to NERA, is a conscience-shocking sentence for those crimes or represents an abuse of the trial court's wide discretion over sentencing. See State v. Case, 220 N.J. 49, 54 (2014); State v. Bieniek, 200 N.J. 601, 607-08 (2010).

Affirmed in part, remanded solely for correction of the JOC.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3162-16T1