# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0381-20

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

W.J.H., III,[1]

    Defendant-Appellant.

_____

> Argued May 18, 2022 – Decided June 15, 2022
>
> Before Judges Hoffman, Whipple and Geiger.
>
> On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 14-06-1537.
>
> Alan L. Zegas argued the cause for appellant (Law Offices of Alan L. Zegas, attorneys; Alan L. Zegas and Joshua M. Nahum, on the briefs).
>
> Dina R. Khajezadeh, Assistant Prosecutor, argued the cause for respondent (Bradley D. Billhimer, Ocean

---

[1] We use initials to protect the child victims of sexual assault or abuse. R. 1:38-3(c)(9).

County Prosecutor, attorney; Samuel Marzarella, Chief Appellate Attorney, of counsel; Dina R. Khajezadeh, on the brief).

PER CURIAM

Defendant W.H. appeals from a September 3, 2020 judgment of conviction after a jury found him guilty of twelve sexual abuse offenses involving his niece M.M., born in 1995, and his daughter N.H., born in 1996, who were children at the time of the alleged offenses. Defendant chiefly contends testimony from M.M.'s friend and her aunt were improperly admitted, and evidence of prior sexual activity of M.M. was improperly excluded. We affirm.

Defendant specifically raises the following issues on appeal:

POINT I:

THE COURT ERRED BY PERMITTING THE EXTENSIVE FRESH COMPLAINT TESTIMONY FROM THREE WITNESSES.

A. FRESH COMPLAINT TESTIMONY WAS INAPPROPRIATE BECAUSE THERE WERE NO ALLEGATIONS OF RECENT FABRICATION.

B. N.H.'S COMPLAINT WAS TOO REMOTE IN TIME TO SATISFY THE FRESH COMPLAINT REQUIREMENT.

2

C. M.M.'S DISCLOSURE TO DAWN STOUT WAS NOT A FRESH COMPLAINT BECAUSE IT WAS GIVEN IN RESPONSE TO INTERROGATION BY THE AUTHORITIES.

D. THE FRESH COMPLAINT TESTIMONY EXCEEDED THE PROPER SCOPE OF SUCH TESTIMONY.

POINT II:

THE COURT ERRED BY PROHIBITING CROSS-EXAMINATION OF A COMPLAINING WITNESS REGARDING A PRIOR FALSE ACCUSATION OF SEXUAL ABUSE.

POINT III:

THE STATE COMMITTED PROSECUTORIAL MISCONDUCT IN ITS CLOSING ARGUMENT BY IMPROPERLY VOUCHING FOR THE CREDIBILITY OF WITNESSES AND USING PREJUDICIAL IMAGERY IN ITS [POWERPOINT] PRESENTATIONS.

A. THE PROSECUTION IMPROPERLY VOUCHED FOR THE TRUTHFULNESS OF THE TESTIMONY OF M.M. AND N.H.

B. THE PROSECUTION IMPROPERLY EXPRESSED PERSONAL OPINIONS ON THE VERACITY OF DEFENDANT AND CHARACTER WITNESSES.

C. THE PROSECUTION IMPROPERLY USED A [POWERPOINT] PRESENTATION IN SUMMATION TO PREJUDICE THE JURY

A-0381-20

– PHOTOS OF HOME; STATEMENT IN ALL
CAPS OF GUILT.

I.

In June 2010, M.M. disclosed to a high school friend, A.D., through a Facebook conversation that defendant, who was M.M.'s uncle, and M.M.'s cousin X.X., were sexually abusing her. A.D. told her own mother who reported it to the Division of Child Protection and Permanency (Division). The Division began an investigation, and M.M. confirmed the allegation to the investigator Dawn Stout. No charges were brought until three years later when defendant's daughter, N.H., disclosed similar abuse to her mother, P.H, who reported the allegation to the prosecutor's office.

On June 11, 2014, defendant was charged with first-degree aggravated sexual assault of M.M. (a victim less than thirteen years old), N.J.S.A. 2C:14-2A(1); second-degree sexual assault of M.M. (a victim less than thirteen years old and the defendant at least four years older), N.J.S.A. 2C:14-2B; first-degree aggravated sexual assault of M.M. (a victim at least thirteen years of age but less than sixteen years old and the defendant is related to the victim by blood or affinity), N.J.S.A. 14-2A(2); second-degree sexual assault of M.M. (a victim between thirteen and sixteen years old and the actor at least four years older), N.J.S.A. 2C:14-2C(4); fourth-degree criminal sexual contact of M.M.,

N.J.S.A. 2C:14-3B; second-degree endangering the welfare of a child M.M. (actor having a legal duty for the care of or having assumed responsibility for the care of a child), N.J.S.A. 2C:24-4A(1); first-degree aggravated sexual assault of N.H. (a victim less thirteen years old), N.J.S.A. 2C:14-2A(1); second-degree sexual assault of N.H. (a victim less than thirteen years old and the defendant at least four years older), N.J.S.A. 2C:14-2B; first-degree aggravated sexual assault of N.H. (a victim at least thirteen years of age but less than sixteen years old and the defendant is related to the victim by blood or affinity), N.J.S.A. 14-2A(2); second-degree sexual assault of N.H. (a victim between thirteen and sixteen years old and the actor at least four years older), N.J.S.A. 2C:14-2C(4); fourth-degree criminal sexual contact of N.H., N.J.S.A. 2C:14-3B; and second-degree endangering the welfare of a child N.H. (actor having a legal duty for the care of or having assumed responsibility for the care of a child), N.J.S.A. 2C:24-4A(1).

The case went to trial, but, before allowing M.M. to testify at trial, the court conducted an N.J.R.E. 104 hearing on the State's motion to admit the testimony of A.D., P.H. and Stout as fresh complaint witnesses pursuant to N.J.R.E. 803(c)(2). A.D. was a high school friend of M.M. P.H. is N.H.'s mother and was married to defendant. The State also moved to deem certain

A-0381-20

statements made by M.M., consisting of an allegedly prior false statement of sexual assault, inadmissible pursuant to N.J.S.A. 2C:14-7 (permitting parties to file what is commonly referred to as a "rape shield" motion).

A.D. testified that, via Facebook chat, M.M. wanted to tell her a secret involving defendant and M.M.'s oldest cousins. M.M. told A.D., "It happens every time I sleep over[.] It happens when everyone is asleep and my uncle and oldest cousins are the ones who do this." M.M. later told A.D. in the same Facebook chat that it was her "uncle really" who was raping her. M.M. also testified as to the State's rape shield motion. The court granted both motions. The court granted the State's motion to admit A.D., P.H., and Stout's fresh complaint testimony and, as to the State's rape shield motion, the court precluded cross-examination of M.M.

The court began the analysis by considering whether to apply the Guenther[2] test or the rape shield test, N.J.S.A. 2C:14-7. The court found "sexual contact indisputably occurred," and seemed to find that M.M.'s statements regarding her sexual activities with X.X. were probably true. The court further found that M.M.'s statements to A.D. regarding X.X. did not rise to the level of a criminal allegation as M.M. was mainly referring to defendant

---

[2] State v. Guenther, 181 N.J. 129 (2004).

having intercourse with her, and she testified at the hearing that she and her cousin were engaging in experimental touching. The court also noted that

> [m]oreover, M.M. clarified immediately during the chat that she was only really discussing the actions of her uncle with her friend. When considered in the context of the entire chat, where M.M. discusses her confused feelings, she appears to have only lumped in the touching with her cousin as a shameful act. [A.D.] testified that she considered the disclosure during the chat to be M.M. telling her about her uncle sexually abusing her.

The court also concluded that M.M.'s consensual exploring and touching with her cousin qualifies as sexual conduct. Thus, the rape shield law applies, and the issue is whether the evidence is admissible.

The court then analyzed the issue under the two-step Budis[3] and Garron[4] test. The court first concluded "[t]he probative value of [M.M.'s] statement referencing her cousin is slight as it pertains to [M.M.'s] credibility." M.M. immediately clarified she was only really talking about her uncle. The court then concluded:

> [T]he prejudicial effect of this statement is great. M.M. disclosed consensual touching with her biological cousin. It's quite possible that jurors will find this to be upsetting. The differences between

---

[3]  State v. Budis, 125 N.J. 519 (1991).

[4]  State v. Garron, 177 N.J. 147 (2003).

A-0381-20

touching with the cousin and rape with the uncle may confuse the jurors as to the issues of the present case . . . . To allow this testimony to be elicited at trial would gravely impact victims reporting of sexual abuse, essentially punishing anyone who slipped up during a disclosure and said something they did not mean. Critical to this last point is that the recipient of the chat, [A.D.], walked away at the end of the chat thinking M.M. had just accused her uncle of raping her and not a thought was given to the cousin.

The first jury trial resulted a mistrial due to the jury's inability to reach a unanimous verdict. On January 7, 2020, the court denied a motion for reconsideration of the fresh complaint testimony of A.D., P.H., and Stout and the redacted Facebook chat between M.M. and A.D.

The second jury trial took place from January 9 to January 22, 2020. A.D. testified as a fresh complaint witness about the Facebook chat. M.M. told A.D. a secret involving defendant that started when M.M. was twelve years old. M.M. stated that when she slept over defendant's house, defendant touched her and "put his thing in [her]" in the middle of the night and she would fall back asleep. A.D. apologized to M.M. because she felt terrible, and the two started crying as they continued to chat. M.M. told her how it happened while she slept, she would wake up, then fall back asleep. M.M. explained she would sleep at defendant's house because the family would go to

8

church on Sunday morning. M.M. did not want anyone to know and coped by cutting her wrists. A.D. told her mother about what M.M. told her.

Next, Stout testified. She worked at the Division as an intake caseworker. In that role, she investigated allegations of abuse and neglect. On July 26, 2010, Stout and another caseworker went to M.M.'s home and spoke with M.M. privately. At first, M.M.'s demeanor was "open, easy to engage," as she spoke about enjoying her summer. When the Division workers asked whether M.M. learned about rape, sexual abuse, and inappropriate sexual behaviors, she answered affirmatively, and then became "quieter . . . not engaging easily answering . . . questions." M.M. sat on the couch and pulled her legs to her chest. The Division workers asked whether M.M. was ever raped or if anyone ever touched her private areas. M.M. shrugged her shoulders in response to both questions. Her demeanor changed to no longer answering questions and making eye contact. The caseworkers explained they had gotten a call with concerns that someone raped her. M.M. began crying and nodding her head "yes." When asked if the allegations were true, she continued nodding her head "yes." M.M. was crying and nodded her head "yes" when asked if defendant put his penis inside her. M.M. sobbed and did not make eye contact through the entire interview.

A-0381-20

The court was prepared to give the fresh complaint jury charge in conjunction with the testimonies of A.D. and Stout. Defense counsel requested that the court give the charge at the end of the trial.

M.M. testified that incidents began when she was twelve years old. She visited defendant's house and sometimes slept over with her cousin N.H. When M.M. slept over, defendant touched her sometimes over her clothes, sometimes under them, when she was sleeping on the floor of the living room or the couch. N.H. was often next to M.M. M.M. remembered a time when she was thirteen or fourteen when she was sleeping on the living room floor with only a t-shirt and underwear on. Defendant took off her underwear and performed oral sex on her. Then he put his penis inside of her. She kept quiet about it because she was scared and did not want to break up the families as they were close. She recalled another time when she was twelve or thirteen when she was outside with only defendant, who pulled her on to his lap and touched her over her clothes, "playing with [her] vagina." Defendant stopped when some children started to come outside. M.M. recalled another time when defendant picked her up in the living room, carried her to his room, laid her down on the bed, pulled down her pants and underwear, and performed oral sex on her and made her perform oral sex on him. Defendant "quite often" and

A-0381-20

"a lot of times" "touched [her weirdly]" when she slept over. Sometimes if they were watching a movie, defendant would sit next to M.M. on the couch, put a blanket over them, and put his fingers inside of her.

Her abuse stopped in summer of 2010 after M.M. told A.D., A.D. told her mother, and the Division came to M.M.'s house. Detective John Murphy of the Ocean County Prosecutor's Office showed M.M. pictures depicting outlines of people, asking what defendant touched and what she touched, and she identified the areas on the pictures. When asked why she was testifying, M.M. answered, "So it doesn't happen to anyone else."

Detective Murphy testified for the State. When he interviewed M.M., she was "very withdrawn, she was very hesitant to speak about the allegations. It seemed like as cooperative as she was, it appeared to me that it was very difficult for her to talk about the subject matter." M.M. directed him to N.H.

P.H. testified from 1995 until October 2019, she lived with defendant and her four children. On October 20, 2013, she went upstairs to speak with N.H. who was sitting on her bed behind a pillow and had her hands in her mouth. N.H. said that M.M. was not lying, and she was pointing to herself, which P.H. understood as N.H. saying that it happened to her, too. N.H. said that defendant was "doing it to her, too." P.H. described her own feelings as:

11

> [s]ad, mad, and I felt I let her down protecting her, but I didn't think I had to protect her from her dad. And I felt, a part of me felt like for three years it was going back and forth, who is telling the truth, who is not, who is telling the truth. And that was kind of like a confirmation.

The next day, P.H. called the authorities.

N.H. testified. She and M.M. were "inseparable . . . like sisters . . . very close, spen[ding] every weekend together . . ." at sleepovers at defendant's. They slept mostly in the living room and sometimes in the game room. She had a "general idea" that defendant was sexually abusing M.M. because defendant "would use his tongue, the tip of his finger and the tip of his penis to rub, go around like my vagina, never in, but like around that area."

N.H.'s earliest memory of defendant touching her in that way was in fourth grade when she was between nine and ten years old. She was laying on her parents' bed, and he pulled her pajamas down and started licking around her vagina with his tongue. In fifth grade, it happened twice. One time, she was sitting on the couch playing Nintendo DS and defendant did the same thing, licking her vagina. The other time, she was sitting on the couch with defendant with a blanket over them. He put his finger around her vagina, grabbed her hand, and tried to get her to touch herself.

12

The year before M.M. disclosed, when N.H. was in seventh grade, defendant would lay next to N.H. in her brother's room and use his tongue, tip of his finger, or tip of his penis around her vagina. N.H. recalled another time when she was in the hallway with defendant, who pulled his pants down and tried to get her to perform oral sex on him. The incidents happened between five and ten times.

N.H. realized the situations with defendant were wrong when M.M. disclosed the abuse, and defendant told N.H. not to tell anyone. When M.M. disclosed, N.H. was thirteen, and the abuse stopped. N.H. was terrified to disclose the abuse was happening to her, too. She stated, "[I] knew if I said yes, my dad would go to jail and I was terrified at the time of him going to jail, scared of losing the house, scared of, we had so many pets, and like I was so scared [of] losing them. . . ." When N.H. was asked why she was testifying, she responded, "Because I want justice for me and M.M. and if anyone else was like abused by my dad that's not known of."

Defendant testified. He confirmed that the Division visited his house on July 26, 2010 because M.M. made an allegation against him. He denied M.M.'s and N.H.'s allegations. He admitted massaging M.M.'s legs, neck, and feet.

On January 22, 2020, the jury returned a verdict of guilty on all twelve counts of the indictment. On August 24, 2020, the court sentenced defendant to an aggregate thirty-year prison term subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and five years of parole supervision upon release and further subject to Megan's Law, N.J.S.A. 2C:7-12 to -19, and Parole Supervision for Life. On September 3, 2020, the court entered a judgment of conviction. This appeal followed.

## II.

Defendant argues that the court erred in permitting fresh complaint testimony from A.D., Stout, and P.H. because there were no allegations of recent fabrication; N.H.'s complaint was too remote in time; M.M.'s disclosure to Stout was not a fresh complaint because M.M. was responding to interrogation by the authorities; and the fresh complaint testimony exceeded the proper scope of such testimony, which defendant did not raise before the trial judge. We reject these arguments.

The fresh complaint doctrine developed in response to jury bias against a victim who did not immediately report they were raped. State v. Hill, 121 N.J. 150, 162-163 (1990). The rule's purpose "is to prove only that the alleged victim complained, not to corroborate the victim's allegations concerning the

crime." State v. Bethune, 121 N.J. 137, 146 (1990). Under the fresh complaint rule, the State can present "evidence of a victim's complaint of sexual abuse, [which is] otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." State v. R.K., 220 N.J. 444, 455 (2015). "Only the facts that are minimally necessary to identify the subject matter of the complaint should be admitted. . . ." Id. at 456.

"[T]o qualify as [a] fresh complaint, the victim's statements to someone she would ordinarily turn to for support must have been made within a reasonable time after the alleged assault and must have been spontaneous and voluntary." Hill, 121 N.J. at 163. "Only the fact of the complaint, not the details, is admissible." Ibid. With respect to allegations by children,

> New Jersey courts recognize that children may be too frightened and embarrassed to talk about sexual abuse, and that it is therefore necessary to be flexible in applying "fresh complaint" guidelines to complaints of children who allegedly have been sexually abused. We recognize also that not all questioning preceding a complaint deprives an utterance of the spontaneity and voluntariness needed for it to be admissible under the fresh complaint rule.
>
> [Bethune, 121 N.J. at 144.]

In addition,

A-0381-20

Trial courts should instruct the jury of the limited role that fresh-complaint evidence should play in its consideration of the case. The trial court should make clear that a fresh complaint does not bolster the victim's credibility or prove the underlying truth of the sexual assault charges but merely dispels the inference that the victim was silent.

[Id. at 148.]

We "review the admissibility of fresh complaint evidence under an abuse of discretion standard." State v. L.P., 352 N.J. Super. 369, 380-81 (App. Div. 2002) (citing Hill, 121 N.J. at 167-68). "The Court finds an abuse of discretion when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467-68 (2012) (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 123 (2007)). "If a defendant . . . does not object or otherwise preserve an issue for appeal at the trial court level, we review the issue for plain error." R. 2:10-2.

We reject defendant's first argument, notably, not raised before the trial judge, that the fresh complaint rule requires an allegation of recent fabrication. The fresh complaint rule as articulated in Hill and Bethune does not contain this element. Moreover, the court properly applied the rule in admitting the fresh complaint evidence to prevent any potential jury bias based on the delay

16

between the alleged abuse and the victims' disclosure. M.M. testified defendant began to abuse her when she was twelve years old, and she disclosed to A.D. when she was fourteen in 2010. N.H. testified defendant began to abuse her when she was between nine and ten years old, and she disclosed to her mother when she was sixteen in 2013. Thus, because both victims here reported the abuse years after it first began, the fresh complaint testimony was relevant to "negate the inference that the [victims'] initial silence or delay indicates that the charge[s] [were] fabricated." R.K., 220 N.J. at 455.

Further, the court's admission of the fresh complaint was not "clearly capable of producing an unjust result," R. 2:10-2, because the court correctly instructed the jury of the fresh complaint rule's limited purpose, and the jury is presumed to follow the court's instructions. State v. Burns, 192 N.J. 312, 335 (2007).

The court did not abuse its discretion in finding N.H.'s complaint was not too remote in time to constitute a fresh complaint. Defendant's abuse of N.H. began when she was nine or ten years old and stopped when she was about thirteen when M.M. disclosed her abuse in 2010. N.H. disclosed to her mother in 2013 when she was sixteen, making the delay about three years. She was "terrified" of disclosing her father sexually abused her because of the

17

potential consequences. Thus, because of N.H.'s young age and fear of disclosure, the court did not abuse its discretion to flexibly apply the fresh complaint rule to admit P.H.'s testimony. See Bethune, 121 N.J. at 143-44; State v. W.B., 205 N.J. 588, 618 (2011) ("[T]he reasonable time component of the fresh complaint rule must be applied flexibly 'in light of the reluctance of children to report a sexual assault and their limited understanding of what was done to them.'") (internal citation omitted).

We also agree with the trial judge that M.M.'s disclosure to Stout was a fresh complaint even though M.M. was responding to interrogation by the authorities. The court found Stout did not question M.M. in a coercive manner and did not ask leading questions; Stout's testimony did not divulge unnecessary details and was not cumulative; and Stout's testimony was necessary to show that M.M. knew what she disclosed to A.D. Although M.M. did not have a close relationship with Stout, the court noted that Stout was a person with whom M.M. would confide. Moreover, Bethune permits fresh complaint testimony when the interrogation of a child victim was not coercive. 121 N.J. at 144-45. Thus, the court did not abuse its discretion in flexibly applying the fresh complaint rule to admit Stout's testimony.

A-0381-20

We conclude defendant's fourth argument, which was not raised before the trial judge, that the fresh complaint testimony at trial exceeded the proper scope of such testimony, has merit. However, the court's careful and thorough jury instructions prevented the error from producing an unjust result. R. 2:10-2; Burns, 192 N.J. at 335.

The error was the admission of excessive details of A.D., Stout, and P.H.'s testimonies, which exceeded the permissible scope of fresh complaint testimony. "[D]etails of the offense should be confined to those minimally necessary to identify the subject matter of the victim's complaint." State v. J.S., 222 N.J. Super. 247, 257 (App. Div. 1988). The fresh complaint testimonies exceeded what was "minimally necessary" to show the victim disclosed. Ibid. However, this plain error was not "clearly capable of producing an unjust result." R. 2:10-2. Immediately following A.D. and Stout's testimonies, the court was prepared to give the fresh complaint jury charge. But defense counsel requested that the court give it at the end. Accordingly, the court gave proper jury instructions on the fresh complaint evidence. The court emphasized the fresh complaint testimonies' limited purpose for negating any inference that the victims' claims are false because of their silence or delayed disclosure. The court stated that such testimony does

not strengthen the victims' credibility or prove the underlying truth of their claims of sexual abuse. The court appropriately instructed the jury regarding the limited use of the fresh complaint evidence. "One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions." Burns, 192 N.J. at 335. As a result, the error was not "clearly capable of producing an unjust result . . . ." R. 2:10-2.

III.

Defendant next argues the court erred by barring cross-examination of M.M. regarding her prior accusation of X.X. as another abuser. More specifically, defendant argues that the court erred by finding M.M. did not make a false criminal allegation when she told A.D. defendant and X.X. engaged in sexual activity with her, and later clarified that she was mainly referring to defendant. Defendant argues M.M.'s later statement that the interactions with her cousin were consensual did not negate the initial false allegation. Further, defendant argues that the court erred in concluding the rape shield law applied because the sexual conduct between M.M. and her cousin likely occurred. We disagree.

A defendant may introduce evidence of a prior false criminal accusation to challenge a victim's credibility. N.J.R.E. 608(b). However, the rape shield

A-0381-20

law, N.J.S.A. 2C:14-7, may bar evidence of a victim's previous sexual conduct if the evidence is irrelevant and "the probative value of the evidence offered substantially outweighs its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim."

Our Supreme Court stated in Guenther:

> In deciding whether to permit the impeachment of a victim-witness who allegedly made a prior false accusation, trial courts must first conduct an admissibility hearing pursuant to N.J.R.E. 104. At that hearing, the court must determine by a preponderance of the evidence whether the defendant has proven that a prior accusation charging criminal conduct was made by the victim and whether that accusation was false. That standard strikes the right balance, placing an initial burden on the defendant to justify the use of such evidence while not setting an exceedingly high threshold for its admission. We note that the admission of this type of specific conduct evidence is an exception to N.J.R.E. 608 and should be limited only to those circumstances in which the prior accusation has been shown to be false. Among the factors to be considered in deciding the issue of admissibility are:
>
> > 1. whether the credibility of the victim-witness is the central issue in the case;
> >
> > 2. the similarity of the prior false criminal accusation to the crime charged;

3. the proximity of the prior false accusation to the allegation that is the basis of the crime charged;

4. the number of witnesses, the items of extrinsic evidence, and the amount of time required for presentation of the issue at trial; and

5. whether the probative value of the false accusation evidence will be outweighed by undue prejudice, confusion of the issues, and waste of time.

[181 N.J. at 157.]

Here, the court did not abuse its discretion in precluding defendant from cross-examining M.M. on the sexual interactions with X.X. The judge properly considered the Facebook chat in its entirety, the substance of M.M.'s disclosure, and the surrounding circumstances. State v. Bray, 356 N.J. Super 485, 495-96 (App. Div. 2003). A.D. testified that when M.M. first disclosed to A.D. via Facebook chat that defendant and X.X. touched her, M.M. soon clarified in the same chat that it was her "uncle really" who raped her. M.M. did not share anything else regarding X.X. who is about a year older than her. At the N.J.R.E. 104 hearing, M.M. testified that there was no penetration, and she described the interactions with X.X. as experimental and consensual.

22

After hearing A.D.'s and M.M.'s testimony, the court stated that M.M. immediately clarified she was talking about her uncle, and it considered "the context of the entire chat, where [M.M.] discusse[d] her confused feelings, [and] appear[ed] to have only lumped in the touching with her cousin as a shameful act." The judge also noted that A.D. understood M.M. to be disclosing that only defendant raped her. Thus, ample evidence in the record supports the trial court's conclusion that M.M.'s allegation of sexual conduct with her cousin was probably true, but that such conduct did not rise to the level of a criminal accusation. Moreover, because M.M. did not make a criminal allegation against her cousin, the court did not make a "clear error in judgment," State v. Scott, 229 N.J. 469, 479 (2017), to conclude the rape shield law—not N.J.R.E. 608(b)—applied to prevent admission of M.M.'s previous sexual conduct.

## IV.

Defendant next argues that the State committed prosecutorial misconduct by allegedly vouching for the truthfulness of M.M. and N.H.'s testimony, expressing the prosecutor's personal opinions on the defendant and his character witnesses' truthfulness, and using a PowerPoint presentation in

summation that prejudiced the jury. Finding no record of egregious or unfair conduct, we reject these arguments.

"[P]rosecutorial misconduct can be a ground for reversal where the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial." State v. Frost, 158 N.J. 76, 83 (1999). "[P]rosecutors are given wide latitude in making their summations and may sum up 'graphically and forcefully.'" State v. Garcia, 245 N.J. 412, 435 (2021) (quoting State v. Johnson, 31 N.J. 489, 510 (1960)). "'[P]rosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries' and are therefore 'afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented.'" State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting Frost, 158 N.J. at 82). Prosecutors may not make a prejudicial assertion that is not "sufficiently tied to the evidence." State v. Rivera, 437 N.J. Super. 434, 463 (App. Div. 2014). "Visual aids such as PowerPoint presentations must adhere to the same standards as counsels' spoken words." State v. Williams, 244 N.J. 592, 617 (2021). Having reviewed the arguments defendant asserts about the prosecutor's statements, we reject them as unpersuasive.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0381-20